Todd M. Schneider (SBN 158253)
Mark T. Johnson (SBN 76904)
Kyle G. Bates (SBN 299114)
SCHNEIDER WALLACE
COTTRELL KONECKY
WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone:  (415) 421-7100
Facsimile:  (415) 421-7105
tschneider@schneiderwallace.com
mjohnson@schneiderwallace.com
kbates@schneiderwallace.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| MARK BURGESS, RHONDA JOHNSON, LARRY LOPEZ, HOLGER MEYER, and ALAN B. MUNNS | Case No.: |
| | **COMPLAINT** |
| Plaintiffs, | **CLASS ACTION (ERISA)** |
| v. | |
| HP INC., FIDELITY MANAGEMENT TRUST COMPANY, FIDELITY INVESTMENTS INSTITUTIONAL OPERATIONS COMPANY, and UNITED AIRLINES, INC. | |
| Defendants. | |

**PRELIMINARY STATEMENT**

1.     Qualified retirement plans that are subject to the provisions of the Employee

Retirement Income Security Act of 1974, as amended ("ERISA"), generate an abundance of cash.

Plans acquire cash in a variety of ways:  cash contributions; sales of investments such as interests in

collective investment trusts and redemptions of mutual fund shares; revenue sharing payments from fund managers; repayment of participant loans; and interest earned on the cash, to name just the principal sources.

2.     The individual Plaintiffs in this case are employees of HP Inc. ("HP") and United Airlines, Inc. ("UAL") and participants, respectively, in the Hewlett-Packard Company 401(k) Plan (the "HP Plan") and the United Airlines Ground Employee 401(k) Plan (the "UAL Ground Plan"), both of which are profit-sharing plans with cash-or-deferred arrangements.

3.     The HP Plan and the UAL Ground Plan are participant-directed individual account plans as defined in ERISA § 3(34), 29 USC § 1003(34).

4.     For calendar year 2012, the HP Plan received cash contributions of $1,012,004,115, and approximately $20,000,000 in participant loan repayments, as reported on the Plan's Annual Return on Form 5500.  During 2012, the HP Plan made "[b]enefit payment and payments to provide benefits: . . . *[d]irectly to participants or beneficiaries*, including direct rollovers" of $1,945,766,599.

5.     The UAL Ground Plan is invested through a Master Trust arrangement and all of the assets of the UAL Ground Plan, along with all the assets of the United Airlines Flight Attendant 401(k) Plan (the "Flight Attendant Plan") and the United Airlines Management and Administrative 401(k) Plan (the "Admin Plan") (collectively, the "UAL Plans") are held in the United Airlines, Inc. 401(k) Plans Master Trust (the UAL Master Trust").

For calendar year 2012, the UAL Master Trust received cash contributions of $255 million as reported on the UAL Plans' Annual Returns on Form 5500.  During 2012, as reported on the UAL Plans' Annual Returns, the Master Trust made "[b]enefit payment and payments to provide benefits: . . . *[d]irectly to participants or beneficiaries*, including direct rollovers" (emphasis added) of $314 million.

6.      Fidelity Management Trust Company ("FMTC") serves as the Trustee for the UAL Master Trust and served as Trustee for the HP Plan during most of the relevant period until January 2, 2013, and Fidelity Investments Institutional Operations Company ("FIIOC") still serves as the HP Plan's recordkeeper.

7.      As a general rule, cash contributions become "plan assets," as that term is defined in ERISA Section 3(42), 29 U.S.C. § 1002(42), and the regulations thereunder, no later than the date those cash contributions are delivered to the Trustee of the Plan.

8.      During 2014, the HP Plan offered participants the opportunity to invest their individual accounts in any of approximately 28 different designated investment alternatives ("investment options"). The UAL Master Trust offered participants approximately 30 different investment options, including an employer stock fund and self-directed brokerage accounts.

9.      Participants have the opportunity to allocate their existing account balances among the available investment options. Participants also have the opportunity to designate how their current and future contributions and current and future matching contributions will be invested.

10.      Participants have the right to take certain withdrawals from the Plan while they are employed and after termination of employment, and to borrow from their accounts. Withdrawals can take the form of hardship withdrawals, in-service distributions, participant loans and lump-sum distributions at retirement or termination of employment.

11.      Withdrawals, loans and distributions are generally made in cash and require that all or a portion of a participant's investments be converted to cash.

12.      A significant percentage of those withdrawals, loans and distributions are made by check. Withdrawals, distributions and loans are also made by electronic funds transfers ("EFT").

13.      In large plan like the HP Plan and the UAL Master Trust, there are hundreds if not thousands of transactions occurring on a daily basis that require a transfer of cash. For simplicity and

operational efficiency, all of these cash transactions are managed through an omnibus account that, for purposes of this Complaint, will be referred to as the "cash management account" or CMA.

14.     From a legal, financial accounting, and logical perspective, all of the cash generated as a result of plan operations—employer and employee contributions, loan repayments and sales of securities owned by a plan—should belong to the plan and be held in trust by or for the benefit of the plan.  Cash contributions to qualified retirement plans, such as the HP and UAL Plans, clearly become plan assets when deposited into trust.  When those plan assets are used to purchase investment securities, including mutual funds shares, securities held in separately managed accounts and interests in collective investment trusts, those investments are plan assets and are registered in the name of the Plan's Trust.  When those investments are liquidated to provide cash for distributions, loans and withdrawals to participants, the cash received by the Plans, or by Fidelity as Trustee for the Plans, is also a plan asset.

15.     The cash received from the liquidation of plan assets is recorded on the books of the Trust as having been received by the Trust, and should be managed by the Trustee solely in the interest of the Plans and their participants for the purpose of providing them plan benefits.

16.     But that is not how Fidelity, as trustee and fiduciary to the HP and UAL Plans and the putative Float Plans Class and HP and UAL Plan Participant Class, manages the cash generated by its qualified retirement plan customers.  After the cash generated by a Plan transaction is credited to the account of the Plan, Fidelity effectively withdraws that cash from the Plan and deposits that cash into an account maintained in the name of or for the benefit of Fidelity, and Fidelity uses that cash for its own benefit or for its own account, in violation of its fiduciary obligations under Section 404 and the prohibited transaction rules of Section 406 of ERISA, 29 USC §§ 1104 and 1106.

17.     The Plaintiffs bring this action on behalf of the HP Plan and all other similarly-situate individual account plans subject to the terms of ERISA and for which Fidelity acts as Trustee (the "Plans").

### OPERATION OF INDIVIDUAL ACCOUNT PLANS

18.     In order to understand the complexity of qualified retirement plan operations, and the manner in which Fidelity has manipulated operations for its own benefit, it will be useful to examine those operations through a simplified hypothetical 401(k) plan sponsored by an employer with ten employees.  All active employees are eligible to participate by making a deferral election, authorizing the employer to withhold a specified percentage of their pay and to contribute the amount withheld to the Plan.  The Plan has five investment choices:  three mutual funds, a stable value fund that is operated as a managed separate account[1]; and an employer stock fund. The plan allows participants to direct the investment of their accounts into any of the available investment options.  Participants can direct how their deferral elections will be invested and they can reallocate their account balances on a daily basis.  Participants can borrow up to fifty percent of their account balances and the loan will be repaid to their account through additional payroll deductions.  Participants can elect to receive a lump sum distribution of their accounts upon termination of employment.  All employees earn $60,000 per year and are paid monthly on the first day of the month.

19.     At the inception of the plan, five employees have elected to participate and all five elect to defer ten percent of their pay, or $500 per month, and allocate their contributions among the investment choices in accordance with the following table:

---

[1] A managed separate account is not like a mutual fund.  There is no legal entity like a registered investment company in which the plan invests. The plan hires an investment manager to invest plan assets in accordance with a set of investment guidelines and the plan directly owns all of the assets of that account.  A stable value fund is essentially a managed bond fund, and in a stable value managed separate account, the plan will directly invest in a portfolio of government and corporate fixed income securities.

| *Employees* | *Mutual Fund A* | *Mutual Fund B* | *Mutual Fund C* | *Stable Value* | *Co. Stock* |
|---|---|---|---|---|---|
| Joe | $100 | $100 | $100 | $100 | $100 |
| Jane | $100 | $100 | $100 | $100 | $100 |
| John | | $250 | | | $250 |
| Jim | | $250 | $250 | | |
| Jill | | | | $500 | |
| TOTALS | $200 | $700 | $450 | $700 | $450 |

20.    In securities trading parlance, mutual fund trades settle (meaning the cash price is delivered) the day after the trade date and stock trades settle on the third day after the trade date, which affects the way in which plan cash is managed.  In the hypothetical plan (and assuming complete efficiency), employee deferrals are withheld from participants' pay on payday and deposited into the plan trust on that same day.

21.    On the first day of operation of the hypothetical Plan, deferrals are withheld from participants' pay and contributions are deposited into the Trust (Day 1).  That same day, the trustee executes trades in accordance with participants' instructions, and in our example, executes a "buy" order for $200 of Mutual Fund A, $700 of Mutual Fund B, $450 of Mutual Fund C, $450 of Company Stock, and a $700 interest in the Stable Value fund.  The cash required for all these transactions, however, is not immediately paid to the mutual funds or the seller of the Company Stock because of the trade settlement rule recited above.  Nonetheless, Fidelity withdraws the total amount of cash from the plan and deposits it into an account that is maintained for the benefit of Fidelity and held overnight.  The account earns interest on the overnight investment.

22.    The following day (Day 2), Fidelity transfers $200 in cash to Mutual Fund A, $450 in cash to Mutual Fund B, $450 in cash to Mutual Fund C, and $700 in cash to the Stable Value manager.

23.     On Day 4, Fidelity transfers $450 in cash to the seller of the Company Stock.[2]

24.     During the time between the trade date and the settlement dates, Fidelity and not the plan has the use of the cash.

25.     At the end of one year of Plan operation with no changes (and assuming no earnings), participants have accumulated account balances as represented in the following table:

| Employees | Mutual Fund A | Mutual Fund B | Mutual Fund C | Stable Value | Co. Stock |
|---|---|---|---|---|---|
| Joe | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 |
| Jane | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 |
| John | | $3,000 | | | $3,000 |
| Jim | | $3,000 | $3,000 | | |
| Jill | | | | $6,000 | |
| TOTALS | $2,400 | $8,400 | $5,400 | $8,400 | $5,400 |

26.     During that one year period, as a result of monthly contributions and trades described above, Fidelity would have had the use of $24,600 for a total of 12 days (regular monthly contributions used to purchase mutual fund shares or interests in the stable value fund), and $5,400 for a total of 36 days (contributions used to purchase employer stock).

27.      Suppose that on the first day of the second year (Day 1.1), John retires and requests a lump sum distribution of his account to be paid to him by check.  On the same day, the remaining five employees (Anna, Benny, Bjorn, Frieda and David) decide they are going to start participating

---

[2] This is the procedure used for employer stock funds that use share accounting in which the employer stock fund holds only shares of employer stock and all participant trading transactions are effected on the exchange.  Many plans use unit accounting, a method of operating an employer stock fund in which the fund holds approximately two percent of the fund's assets in cash for liquidity purposes rather than only employer stock, so that participant transactions can be settles in cash at the same time as mutual fund transactions.

in the plan at the same 10% deferral rate as the other employees. Anna directs the investment of her contributions into Mutual Fund A, Benny, Bjorn and Frieda invest in Mutual Fund B, and David invests all of his contributions in Company Stock.   Finally, on the same day, Joe elects to move his existing balance out of the stock fund (but does not change the investment allocation for his on-going contributions) and reallocates his stock fund account to Mutual Fund C, and Jane decides to move her account out of Mutual Fund C and into Mutual Fund A (but does not change the investment allocation for her on-going contributions).  Those transactions are represented in the following table:

| *Employees* | *Mutual Fund A* | *Mutual Fund B* | *Mutual Fund C* | *Stable Value* | *Co. Stock* |
|---|---|---|---|---|---|
| Joe | $1,200 +$100 | $1,200 +$100 | $1,200 +$1,200 $100 | $1,200 +100 | $1,200 -$1,200 +$100 |
| Jane | $1,200 +$1,200 +100 | $1200 +100 | $1,200 -$1,200 +100 | $1,200 +$100 | $1,200 +$100 |
| John | | $3,000 -$3,000 | | | $3,000 -$3,000 |
| Jim | | $3,000 +$250 | $3,000 +$250 | | |
| Jill | | | | $6,000 +$500 | |
| Anna | +$500 | | | | |
| Benny | | +$500 | | | |
| Bjorn | | +$500 | | | |
| Frieda | | +$500 | | | |
| David | | | | | +$500 |
| TOTALS | $4,300 | $7,350 | $5,850 | $9,100 | $1,900 |

28.     As a result of those changes, the following steps occur:

    a.     On Day 1.1:

        i.     $4,5000 in cash is contributed to the plan and deposited in trust to the CMA;

        ii.     Fidelity as Trustee executes the following trades:

            1.     Buy $1,900 of Mutual Fund A (Joe's and Jane's monthly allocation of $100, plus Jane's transfer of $1200 from Mutual Fund C, plus Anna's new monthly allocation of $500);

            2.     Sell $1,050 of Mutual Fund B (John cashes out $3,000 due to his retirement, but Joe, Jane, Jim, Benny, Bjorn and Frieda are buying $1,950 of Mutual Fund B for their monthly allocations.  The Plan is effectively re-allocating $1,950 of Mutual Fund B shares that had been allocated to John's account to the accounts of Joe, Jane, Jim, Benny, Bjorn, and Frieda, which avoids any transaction fees related to that transfer);

            3.     Buy $450 of Mutual Fund C (Joe's, Jane's, Jim's monthly allocations.  Joe's transfer out of the Stock Fund and into Mutual Fund C is netted against Jane's transfer from Mutual Fund C to Mutual Fund A.  So the plan is effectively re-allocating $1,200 of Mutual Fund C shares from Jane's account  to Jim's account);

            4.     Sell $3,300 of Company Stock (John and Joe are cashing out of the Stock Fund due to John's retirement and Joe's investment transfer from the Stock Fund to Mutual Fund C, while Joe, Jane and David are buying a total of $700 of Company Stock as part of their monthly allocation.  So the Plan is effectively re-allocating $700 in Company Stock that had been allocated to John's account to Joe, Jane and David);

     5.   Fidelity transfers $4,500 in cash from the Plan's CMA to an account maintained by or for the benefit of Fidelity.

  b.  The following day (Day 1.2), the following transactions occur:

    i.  Fidelity as Trustee transfers $1,900 to Mutual Fund A and $450 to Mutual Fund C in settlement of the previous day's buy trades;

    ii.  Fidelity as Trustee transfers $500 to the Stable Value manager;

    iii.  Fidelity, as Trustee of the Plan, receives $1,050 in cash from Mutual Fund B in settlement of the sell trades executed the previous day, which is deposited into the plan's CMA;

    iv.  Fidelity as Trustee transfers $1,050 in cash from the Plan's CMA to an account maintained for the benefit of Fidelity;

  c.  Two days later (Day 1.4) the following transactions occur:

    i.  Fidelity, as Trustee for the Plan, receives $3,300 in cash in settlement of the Company Stock trades, which is deposited into the plan's CMA;

    ii.  Fidelity transfers $3,300 in cash from the CMA to an account maintained for the benefit of Fidelity.

  d.  On or about the following day (Day 1.5) Fidelity writes a distribution check to John in distribution of his plan account balance.  On information and belief, distribution checks like John's distribution check remain outstanding for an average of 22 days.

    29.   As a result of the contribution, fund transfer and distribution transactions for the hypothetical plan described in the preceding paragraphs, Fidelity would have had the use of $4,500 in cash belonging to the Plan for one day, $1,650 of the Plan's cash for 24 days, and $3,300 of the plan's cash for 22 days, at which time John's distribution check would have been presented for payment.

---

30.     It should be easy to see from this simplified hypothetical plan why all of a plan's cash assets are managed through an omnibus cash management account in order to efficiently net offsetting transactions and reduce transaction costs, and to ensure proper accounting of all plan transactions.

31.     As alleged above, during 2012, the HP Plan received more than $1.1 billion in cash contributions and loan repayments.  Because buy and sell orders for plan investments are netted against each other, it is reasonable to assume that a significant amount of the $1,945 billion in cash needed for HP Plan distributions was derived from contributions and loan repayments.

32.     As alleged above, the UAL Master Trust received $255 million in cash contributions during the 2012 plan year and paid out $314 million is distributions.  It is, therefore, reasonable to assume that a significant amount of the $314 million in cash needed for UAL Plan distributions was derived from contributions and loan repayments.

33.     The calculations get more complicated when participants have taken loans form the Plan and are repaying those loans through additional monthly payroll deduction contributions.

34.     If only 50% of that $2.25 billion in cash distributions made from the HP Plan and UAL Master Trust was distributed to participants by check, Fidelity would have had the use of $1.125 billion in cash generated by the HP Plan and the UAL Plans for an average of 22 days during 2012, and the unrestricted use of the other $1.125 billion transferred by EFT for a period of at least two days.

35.     Likewise, during 2012 alone, Fidelity earned interest on the overnight investment of $1.13 billion in contributions to the HP Plan and $255 million to the UAL Plans.

36.     On information and belief, Fidelity (i) invests the cash generated by plan operations and retains all the earnings with respect to those investments, or (ii) uses that cash for other operational purposes, effectively reaping the benefits of an interest-free loan from all of its plan

customers, (the combination investment earnings and the benefit of having unrestricted and exclusive use of Plan cash, for purposes of this Complaint, will be referred to as "float income").

### FIDELITY'S ROLE AS TRUSTEE

37.     Fidelity Management Trust Company ("Fidelity") acts as the trustee for the UAL Plans and all other Plans in the Class, and served as the trustee for the HP Plan until January 2, 2013. Fidelity Investments Institutional Operations Company serves as the HP Plan's recordkeeper.

38.     Pursuant to Section 2 of the Trust Agreement between HP and Fidelity Trust (the "Trust Agreement"), "[t]he Trust shall consist of an initial contribution of money or other property, all investments made therewith *[and all proceeds thereof, and all earnings and profits thereof]* less payments that are made by the Trustee as provided herein."  Emphasis added.

39.     On information and belief, the provisions of the Trust Agreement for the UAL Master Trust contains provisions that are virtually identical to the provisions of the HP Trust Agreement.

40.     There should be no doubt, therefore, that the cash proceeds of the redemption of mutual fund shares or the sale of any other security owned by the Plans and held in Trust by Fidelity are part of the aforementioned Trust.

41.     Section 3 of the Trust Agreement provides that "Except as provided by applicable law, no part of the Trust may be used for, *or diverted to*, purposes other than the exclusive benefit of the Participants in the Plan or their beneficiaries or the reasonable expenses of Plan Administration." Emphasis added.

42.     Fidelity's duties as Trustee include the effectuation of trades directed by plan participants, the withdrawal of cash from the Plans' Trusts to settle purchases of securities, the receipt of the proceeds of redemptions of mutual fund shares and the sales of other securities on behalf of the Plans as the Plans' Trustee and fiduciary, and the deposit of those proceeds into the Trust for the exclusive benefit of plan participants.

43.     Fidelity diverted part of the Trust—the cash contributions to the Plans and the proceeds of the sale of Plan assets—for a purpose other than the exclusive benefit of the participants in the Plans.  In fact, the diversion had no purpose other than to benefit Fidelity.  There is no reason why a contribution account or disbursement account cannot be maintained in the name of or for the benefit of the Plans and their participants.

44.     Fidelity's practice violates every common notion of how banking practice works when paying any obligation by check.  In a normal situation, the obligor writes a check on its bank account and mails the check to the payee.  The payee deposits the check into his account and the check is processed through the banking system until it is ultimately presented to the obligor's bank for payment.  The money does not leave the obligor's account until the check is presented for payment.

45.     Under Fidelity's benefit payment procedure, the Plan as obligor writes a check to the participant.  More specifically, Fidelity, as the Plans' bookkeeper and agent, writes the check on behalf of the Plan.  But a couple of days before the check is written, Fidelity takes the money out of the Plan's account and deposits it into an account controlled by or maintained for the benefit of Fidelity.  On information and belief, Fidelity then writes the participant's distribution check on a different Fidelity account that is not funded until the check is presented for payment.  Between the time the check is written (in fact, before the check is written), and the time the check is presented for payment, Fidelity has unrestricted use of the cash, and uses it for purposes other than the exclusive benefit of plan participants.  It is the equivalent of a bank taking money out of a customer's checking account as soon as, if not before, the check is actually written rather than when the check is presented for payment.

## FIDELITY'S FIDUCIARY OBLIGATIONS AND BREACHES

46.     ERISA imposes certain fiduciary duties on persons or entities that exercise "any discretionary authority or control respecting management of such plan or exercising any authority or

control respecting management or disposition of its assets." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).   Under the instant circumstances, Fidelity is a fiduciary because it exercised discretionary authority over cash assets of the HP and UAL Plans by either removing those cash assets from the Plans' Trusts, or failing to deposit those cash assets into the Plans' Trusts after receiving those cash assets as Trustee on behalf of the HP and UAL Plans.

47.     Among these fiduciary duties is the duty of loyalty, by which "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." ERISA § 404, 29 U.S.C. § 1104(a)(1)(A).

48.     Fidelity violated its duty of loyalty by engaging in a process for the management of billions of dollars of plan cash assets that was designed to benefit Fidelity by giving Fidelity unrestricted use and control of those cash assets which it exercised for the benefit of Fidelity rather than for the benefit of the Plans and their participants.

49.     Furthermore, ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), expressly provides that a fiduciary shall not "deal with the assets of the plan in his own interests or for his own account."

50.     Fidelity violated the prohibition of ERISA § 406(b)(1) by transferring plan assets to an account that was subject to Fidelity's exclusive control and managing those assets for its exclusive benefit.

51.     ERISA § 406(a)(1), 29USC § 1106(a)(1), prohibits a fiduciary from causing a plan to engage in a transaction that, *inter alia,* constitutes either (i) a lending of money or other extension of credit between a plan and a party in interest, or (ii) a transfer to, or use by or for the benefit of a party in interest.

52.     Fidelity, as Trustee, is a fiduciary to the Plans.

53.     Fidelity Investments Institutional Operations Company ("FIIOC") is the recordkeeper for the HP and UAL Plans and, therefore, a service provider to the Plans.

54.     Section 3 of ERISA, 29 USC § 1002(14) provides in pertinent part, that the term "party in interest" means, *inter alia,* (i) any fiduciary and (ii) a person providing services to such plan. Therefore, Fidelity Management Trust Company, and FIIOC are both parties in interest, as is any other Fidelity affiliate that is providing services to the Plans.

55.     Fidelity violated the prohibitions of ERISA § 406(a)(1) by causing the Plans to either (i) loan money or extend credit to Fidelity by providing Fidelity exclusive use and control of billions of dollars in cash that was held awaiting investment or held while distribution, withdrawal and loan transactions were pending, or (ii) by transferring plan assets to an account that was subject to Fidelity's exclusive control and managing those assets for its exclusive benefit.

56.     Section 403 of ERISA, 29 USC § 1103, requires that all assets of an employee benefit plan shall be held in trust by one or more trustees.  Fidelity violated ERISA § 403 by diverting plan assets out of or away from the Plans' Trusts and into accounts maintained by or for the benefit of Fidelity.

57.     Section 404(a)(1)(D) of ERISA, 29 USC § 1104(a)(1)(D), requires that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and— . . . in accordance with the documents and instruments governing the plan . . . ." Fidelity violated the provisions of  ERISA § 404(a)(1)(D) by diverting plan assets for purposes other than the exclusive benefit of the Participants in the Plan or their beneficiaries or the reasonable expenses of Plan Administration, contrary to the explicit requirements of Section 3 of the Trust Agreement.

58.     Since there is no legal, logical or prudential reason for Fidelity to transfer the Plans' cash assets out of Trust and into an account managed for the benefit of Fidelity during the period in

which distribution, withdrawal, or loan checks are outstanding, the transaction (transferring assets from the Plans' Trusts to a Fidelity-controlled account, or diverting cash that should have been deposited into trust into a Fidelity-controlled account) can only be characterized as either a prohibited interest-free loan from the Plans to a party in interest (Fidelity) or a prohibited transfer of plan assets to, or use by or for the benefit of a party in interest (Fidelity).

59.     The US Department of Labor ("DOL") has made its position clear that the retention of "float" earned when a benefit check is issued to a participant constitutes prohibited self-dealing. See DOL Adv. Op. 93–24A (Sept. 13, 1993); ("[W]here a fiduciary (e.g. Trust Company) exercises discretion with regard to plan assets, its receipt of income from the 'float' on benefit checks under a repurchase agreement with a national bank in connection with the investment of such plan assets would result in a transaction described in ERISA section 406(b)(1)."

60.     The DOL reiterated its position in Field Assistance Bulletin 2002-3 (Nov. 5, 2002) (confirming the DOL's view that "a trustee's exercise of discretion to earn income for its own account from the float attributable to outstanding benefit checks constitutes prohibited self-dealing under section 406(b)(1) of ERISA.").

61.     As a result of Fidelity's breach of its fiduciary duties, over the relevant period, the HP and UAL Plans and the Float Plans Class have lost hundreds of millions of dollars from the diversion of plan assets that would otherwise have been used to provide benefits to participants as earnings of the Plans' Trusts.

## UNITED'S AND HP'S FIDUCIARY OBLIGATIONS AND BREACHES

62.     On information and belief, Defendants HP Inc. and United Airlines, Inc. are the Plan Administrators and named fiduciaries of the HP Plan and the UAL Plans, respectively.

63.     As fiduciaries to the HP and UAL Plans, HP and UAL are obligated to deal with the assets of the Plans subject to a "duty of loyalty" and a "duty of prudence."

64.     The duty of loyalty requires Plan fiduciaries to act solely in the interests of the Plan and its participants and beneficiaries when making decisions regarding the use or disposition of plan assets, as well as in connection with contracting for services.

65.     The duty of prudence imposes a very high standard of care and has been described as a "prudent expert" requirement.  It requires an investigation of the merits of any proposed use or disposition of Plan assets, including the hiring of any service provider and a thorough understanding of the fees being paid for the service being provided, which includes any direct or indirect compensation to be received by the service provider.  Having a prudent process for decision making is a key factor in satisfying the duty of prudence.

66.     As plan fiduciaries, HP and UAL are prohibited from causing the HP and UAL Plans from engaging in any transaction prohibited by ERISA § 406(a) unless that transaction is subject to an applicable exemption.

67.     ERISA § 408(b)(2) provides an exemption for necessary services, which includes recordkeeping and brokerage services, provided that no more than reasonable compensation is paid for such services.

68.     For many years, the DOL has provided guidance to plan fiduciaries regarding the performance of their obligations, including guidance regarding contracting for plan services:

> In selecting a service provider, plan fiduciaries must, consistent with the requirements of section 404(a), act prudently and solely in the interest of the plan's participants and beneficiaries and for the exclusive purpose of providing benefits and defraying reasonable expenses of administering the plan. Except as provided in section 408, plan fiduciaries also have an obligation under section 406(a) not to cause the plan to engage in certain transactions, including a direct or indirect furnishing of goods, services or facilities between the plan and a party in interest. Section 408(b)(2) exempts from the prohibitions of section 406(a) any contract or reasonable arrangement with a party in interest, including a fiduciary, for office space, or legal, accounting or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor.[2]  In carrying out these responsibilities, the Department has indicated that a plan fiduciary must engage in an objective process designed to elicit information necessary to assess the qualifications of the provider, the quality of

services offered, and the reasonableness of the fees charged in light of the services provided.[3]

DOL Field Assistance Bulletin 2002-3 states explicitly that "[t]he primary issue for service providers with float arrangements is whether the provider has disclosed to its employee benefit plan customers sufficient information concerning the administration of its accounts holding float so that the customer can reasonably approve the arrangement based on an understanding of the service provider's compensation."

69.     Since Fidelity has failed to provide sufficient information about the use of the Plans' cash assets, especially during periods in which distribution, withdrawal and loan checks remain outstanding, HP and UAL have, *a fortiori,* failed to obtain sufficient information from Fidelity to appropriately assess the amount of Fidelity's compensation in relation to the services being provided.

70.     Even after the initial selection of Fidelity, HP and UAL failed to monitor and supervise Fidelity in connection with Fidelity's management and use of the Plans' cash assets to the detriment of the Plans' participants. *See Tibble v. Edison International*, __ U.S. __, 135 S. Ct. 1823, 1828 (2015).

71.     HP's and UAL's failure to obtain sufficient information from Fidelity to thoroughly understand the nature and extent of Fidelity's compensation allowed Fidelity to conceal the amount of its compensation and to continue to receive excessive compensation in relation to the services provided for years, and resulted in a failure of the conditions required under ERISA § 408(b)(2) for the transaction with Fidelity to be exempt from the prohibitions of ERISA § 406(a).

---

[3] DOL Field Assistance Bulletin 2002-3, available at https://www.dol.gov/ebsa/regs/fab2002-3.html, last viewed August 16, 2016.

72.     HP's and UAL's failure to obtain sufficient information about Fidelity's compensation caused the HP and UAL Plans to engage in transactions with Fidelity, a party in interest to the HP and UAL Plans, that are prohibited under ERISA § 406(a).

## JURISDICTION AND VENUE

73.     Plaintiffs bring this action pursuant to ERISA §§ 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(2), (3). This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because this action arises under the laws of the United States.

74.     Venue lies in the Northern District of California pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Defendant HP resides within or may be found in this District, the HP Plan is administered in this District, and/or the alleged breaches of the duties imposed by ERISA took place in this District.

## PARTIES

75.     During the class period (defined below), Plaintiffs Mark Burgess, Holger Meyer, and Alan B. Munns have been participants, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the HP Plan. Burgess resides in Frisco, TX.  Meyer resides in Helena, MT.  Munns resides in Ft. Collins, CO.

76.     At all relevant times, Plaintiffs Rhonda Johnson and Larry Lopez have been participants in the UAL Ground Plan.  Lopez currently resides in Northglenn, CO and Johnson currently resides in Compton, CA.

77.     At all relevant times, the HP Plan was an employee pension benefit plan within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and an individual account plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34). Those ERISA-governed individual account retirement plans for which Fidelity serves as Trustee are referred to collectively as "the Plans."

78.     Defendant Fidelity is the Trustee of the UAL Plans, was the Trustee of the HP Plan until January 2, 2013 and is or was the Trustee of the Float Plans Class (as defined below) for all or part of the relevant period. As Trustee, Fidelity was and is a fiduciary to the Plans and has or had primary responsibility for effective administration of the Plans' trading activities and management of the Plans' cash assets generated through that trading activity. These services involve both the grant and exercise of discretionary control by Fidelity over the management of the significant cash flows generated by the Plans and the administration of the Plans' benefit distribution process. Because it has discretionary authority and control over the Plans' cash assets, which are "plan assets" as described above, Fidelity is a fiduciary to the Plans. Fidelity is headquartered in Boston, Massachusetts.

79.     Defendant HP Inc. is the plan sponsor, plan administrator and named fiduciary of the HP Plan.  HP is headquartered in Palo Alto, CA.

80.     Defendant United Airlines, Inc. is the plan sponsor, plan administrator and named fiduciary of the UAL Plans.  United Airlines, Inc. is headquartered in Chicago, IL.

## CLASS ACTION ALLEGATIONS

a.  Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(1), 23(b)(2), or 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following classes of similarly situated persons ("the Classes"):

b.  **The Float Plans Class:**  All defined contribution individual account plans within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), for which Fidelity Management Trust Company or its affiliate served as Trustee and/or recordkeeper and for which it had, or for which it exercised, authority to (A) withdraw assets from the Plan's Trust in connection with the investment of Plan assets, prior to the settlement date with respect to such investments; or (B) prepare and deliver

distribution, withdrawal  and/or loan checks and in connection therewith to withdraw funds from the Plan's trust and deposit those funds into an account or accounts held in the name of Fidelity or its affiliate or maintained by or for the use of Fidelity or its affiliate, at any time from the earlier of (i) six years before the filing of this action, or (ii), in the event the Court determines that Fidelity has concealed the facts and circumstances that would have apprised Plaintiffs and the Class of the existence of Fidelity's breach, the first date on which Fidelity commenced services as Trustee, and in either case, through the date of judgment (the "Float Plans Class Period").

c. **The HP and UAL Plan Participant Class:**  All individuals who were participants in either the HP Plan or the UAL Plans while Fidelity Management Trust Company or its affiliate served as Trustee and/or recordkeeper and for which it had, or for which it exercised, authority to: (A) withdraw assets from the HP and UAL Plans' Trusts in connection with the investment of Plan assets, prior to the settlement date with respect to such investments; or (B), prepare and deliver to participants distribution, withdrawal  and/or loan checks and in connection therewith to withdraw funds from the Plan's trust and in either case to deposit those funds into an account or accounts held in the name of Fidelity or its affiliate or maintained by or for the use of Fidelity or its affiliate, at any time from the earlier of (i) six years before the filing of this action, or (ii), in the event the Court determines that Fidelity has concealed the facts and circumstances that would have apprised Plaintiffs and the Class of the existence of Fidelity's breach, the first date on which Fidelity commenced services as Trustee, and in either case, through the date of judgment.

81.     The members of the class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are, at a minimum, several thousands of members of the Class.[4]

82.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among such questions are:

a.     Whether Fidelity was a fiduciary of the Plans;

b.     Whether Fidelity breached its fiduciary duties with respect to the management of the Plans' cash assets received in trust as plan contributions and cash assets received in trust as a result of the liquidation of plan assets in connection with Plan distributions, loans and withdrawals;

c.     Whether the Defendants breached their duty of loyalty by engaging in a process for the management of billions of dollars of plan cash assets that was designed to benefit Fidelity and not for the benefit of the Plans and their participants;

d.     Whether the Defendants engaged in a prohibited transaction under ERISA § 406(a)(1) by causing the Plans to either (i) loan money or extend credit to Fidelity by providing Fidelity exclusive use and control of billions of dollars in cash that was held awaiting investment or held while distribution, withdrawal and loan transactions were pending, or (ii) by transferring plan assets to an account that was subject to Fidelity's exclusive control and managing those assets for its exclusive benefit;

---

[4] Fidelity provides defined contribution, defined benefit, health and welfare and stock plan services to nearly 20,000 employers.  *See* "Fidelity By The Numbers: Corporate Statistics," available at https://www.fidelity.com/about-fidelity/fidelity-by-numbers/corporate-statistics; last viewed Aug. 12, 2016.

e. Whether the Fidelity Defendants breached their fiduciary duties by receiving excessive compensation in relation to the service provided;

f. Whether the Defendants' acts proximately caused losses to the Plans;

g. Whether the Class is entitled to damages and injunctive relief;

h. Whether Defendants' conduct is permitted based upon any prohibited transaction exemption or other authority.

83. There are no substantial individual questions among the Class claims on the merits of this action.

84. **Rule 23(b)(1)(A) & (B) Requirements.** Class action status in this action is warranted under Rule 23(b)(1)(A), because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for the Defendants. Class action status is also warranted under Rule 23(b)(1)(B), because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

85. **Rule 23(b)(2) Requirements.** Certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

86. **Rule 23(b)(3) Requirements.** Certification under Rule 23(b)(3) is also appropriate because common questions of law and fact clearly predominate over any questions affecting only individual members. Fidelity's system for processing contributions, distributions and transfers was the same for all of its plan clients. Moreover, a class action is superior to the other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is

impracticable.  Furthermore, because the injury suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

87.    **Typicality.**  The Plaintiffs' claims are typical of the claims of the members of the Class because the Plaintiffs and members of the Class sustained injury arising out of the Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein. The Plaintiffs' claims are also typical of the claims of the members of the Class inasmuch as the Plaintiffs seek relief on behalf of the Plans pursuant to ERISA § 502(a)(2), and, thus, the Plaintiffs' claims on behalf of the Plans, participants and beneficiaries are not only typical of, but identical to, the claims of Class members.  If cases were brought and prosecuted individually, each member of the Class would be required to prove the same claims based upon the same facts, pursuant to the same remedial theories, and would be seeking the same relief.

88.    Plaintiffs have been injured by the breaches of fiduciary duty alleged in this Complaint and are committed to fairly, adequately, and vigorously representing and protecting the interests of the members of the class.

89.    Plaintiffs have retained counsel competent and experienced in class action litigation of this nature for this purpose.

90.    Neither Plaintiffs nor their counsel have any interests that might cause them to refrain from vigorously pursuing the claims in this class action.  Thus, Plaintiffs are adequate representatives of the class.

91.    On information and belief, the names and addresses of the class members are available from Fidelity and/or the Plans, and adequate notice can be provided to members of the class to the extent required by Fed. R. Civ. P. 23.

### FIRST CLAIM FOR RELIEF

**(Fidelity Defendants' Breaches of Fiduciary Duty Under ERISA § 404(a), 29 U.S.C. § 1104(a))**

92.     Plaintiffs incorporates each of the proceeding paragraphs as if set forth fully herein.

93.     ERISA defines a fiduciary as anyone who exercises authority or control over the management or disposition of plan assets.  29 U.S.C. § 1002(21)(a).

94.     As set forth above, Fidelity, as Trustee for the Plans, was an ERISA fiduciary for the Plans and their participants and beneficiaries, including Plaintiffs and the members of the Float Plans Class, with respect to the management and control of cash belonging to the Plans.

95.     A fiduciary must discharge his duties "solely in the interest of the plan's participants and beneficiaries" and "for the exclusive purpose" of providing benefits and defraying reasonable expenses of administration.  ERISA § 404(a)(1)(A).  This rule is based on the common law trust duty of undivided loyalty.

96.     Fidelity's' conduct with respect to the management of the cash assets of the Plans directly violated its fiduciary duties to act solely in the interests of plan participants by engaging in a convoluted process for managing cash contributions and cash generated from the liquidation of plan investments that did not incidentally benefit Fidelity while also benefitting the Plans, but which benefitted Fidelity exclusively at the expense of the Plans.

97.     In short, Fidelity diverted billions of dollars of the Plans' assets to Fidelity's exclusive use and control for which the Plans received no compensation or discernible benefit.

98.     Fidelity's breaches caused the Plans to lose substantial amounts of income they would have received had Fidelity engaged in a cash management process that was designed to benefit the Plans.   Conversely, Fidelity profited substantially from the unrestricted use of billions of dollars in cash for which it paid nothing.

99.     ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia,* that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of the fiduciary.

100.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant to bring an action for relief under ERISA § 409.

101.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), permits a plan participant to bring an action to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan.

102.    Fidelity's actions caused the Plans and thus the Plaintiffs and the members of the Float Plans Class to incur losses from diminution of investment returns as well as excessive fees in an amount to be proven at trial and Fidelity is liable for such losses.

103.    Furthermore, Fidelity and its affiliates profited from Fidelity's breaches of fiduciary duty in an amount to be proven at trial and are liable to disgorge such profits wrongfully made through use of the Plans' assets.

### SECOND CLAIM FOR RELIEF

### (Prohibited Transactions Under ERISA § 406(a) and 406(b), 29 U.S.C. §§ 1104(a) and (b) Caused By Fidelity Defendants)

104.    The Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

105.    ERISA § 406(a)(1) provides that a fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . lending of money or other extension of credit between the plan and a party in interest; . . . [or] transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . ." ERISA defines a

"party in interest" to include "any fiduciary (including, but not limited to, any . . . trustee)."  ERISA § 3(14)(H).

106.    As discussed above, the Fidelity Defendants were at all relevant times ERISA fiduciaries and/or service providers with respect to the HP and UAL Plans and the  Float Plans Class. Thus, each Fidelity Defendant was a "party in interest" pursuant to ERISA § 3(14)(H).

107.    FMTC, as Trustee and fiduciary, exercised its discretionary authority with respect to cash belonging to the Plans and diverted that cash into accounts that were maintained by or for the use of, and subject to the exclusive control of, the Fidelity Defendants.

108.    The Fidelity Defendants' diversion of plan assets into accounts controlled by the Fidelity Defendants, and the unrestricted use of those cash assets constitute transactions between a plan and a party in interest within the meaning of ERISA § 406(a)(1).

109.    FMTC knew or should have known that the diversion of plan assets to the exclusive control and benefit of FMTC and/or its affiliates constituted either (i) a prohibited loan or other extension of credit between the Plans and a party in interest, or (ii) a prohibited transfer of plan assets to, or use by or for the benefit of a party in interest.  Accordingly, FMTC caused the Plans to engage in a prohibited transaction under ERISA § 406(a)(1).

110.    Additionally, ERISA § 406(b)(1) prohibits a fiduciary from dealing with the assets of a plan for its own interest or its own account.

111.    Fidelity diverted the Plans' cash assets away from the Plans' trusts and into accounts subject to the exclusive control of Fidelity, and invested those cash assets for its own benefit or used those cash assets for other operational needs of Fidelity and for which the Plans received no discernible or meaningful benefit.  The benefit to Fidelity, on the other hand, was enormous.

112.    The Department of Labor's Field Assistance Bulletin 2002-3 indicates that a financial service provider's use of float income for its own benefit constitutes a prohibited transaction under

ERISA § 406(b)(1) unless the practice is disclosed and openly bargained-for at the time the service provider is retained, and even then, only where the agreement does not permit the service provider to affect (and in particular increase) the amount of its float compensation. The Fidelity Defendants here (1) did not and still have not disclosed the value of the benefit to Fidelity of having unrestricted use of billions of dollars of cash at no cost, (2) did not negotiate for extra compensation in the form of the float income, or provide the Plaintiffs or the Plans with information sufficient for responsible Plan fiduciaries to understand the Fidelity Defendants' compensation, and (3) had discretion to use the float income to pay themselves excessive compensation. FAB 2002-3, therefore, confirms that the Defendants' actions constitute prohibited transactions under ERISA § 406(b)(1).

113.    As a result of the prohibited transactions caused by the Fidelity Defendants, the Plaintiffs and the Float Plans Class suffered losses they would not have suffered had the Plans' cash assets been prudently invested by the Fidelity Defendants for the benefit of the Plaintiffs and the Float Plans Class.

114.    As a result of the prohibited transactions engaged in by the Fidelity Defendants, the Fidelity Defendants profited enormously and should be responsible for disgorgement of those profits to the Plaintiffs and the Float Plans Class.

115.    Pursuant to ERISA §§ 409, 502(a)(2) and 502(a)(3), the Fidelity Defendants are liable to personally make good to the Plaintiffs and the Float Plans Class the damages sustained by the Plaintiffs and the Float Plans Class.

116.    Pursuant to ERISA § 502(a)(3), the Court should also award equitable relief to the Float Plans Class.

### THIRD CLAIM FOR RELIEF

**(Prohibited Transactions Under ERISA § 406(a) and 406(b), 29 U.S.C. §§ 1104(a) and (b) Caused By HP and UAL)**

117.    The Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth in this Third Claim for Relief.

118.    Under ERISA, a fiduciary has a duty investigate and thoroughly understand all of the terms and provisions of agreements for the provision of services to the plans for which it serves as fiduciary, especially the terms and provisions for the service provider's compensation, and a continuing duty to monitor the performance of the service provider and its compensation.

119.    HP and UAL as responsible fiduciaries to the HP and UAL Plans had a duty to ensure that no more than reasonable compensation was paid for the services being provided by Fidelity, including the management of the Plans' cash and the distribution of plan benefits.  The failure of HP and UAL to adequately investigate and understand the procedures used by Fidelity in connection with the HP and UAL Plans' trading activity and the distribution of benefits from the HP and UAL Plans, and the complete failure to evaluate and understand the value of the direct and indirect compensation Fidelity would receive in connection with those services, caused the HP and UAL Plans, respectively, to engage in transactions between a plan and a party in interest that were prohibited under ERISA § 406(a) and not eligible for any available exemption.

120.    HP and UAL failed to make a thorough investigation of Fidelity's compensation received in connection with trust and recordkeeping services in general and specifically with respect to the services provided in connection with the Plan's trading activity and the management of the Plans' cash assets.

121.    ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), prohibits a plan fiduciary from causing the plan to engage in a transaction that constitutes a transfer to, or use by or for the benefit of a party in interest.

122.    The failure of HP and UAL to effectively evaluate Fidelity's conduct in connection with its management of cash assets belonging to the HP and UAL Plans allowed Fidelity to divert those cash assets to the use or benefit of Fidelity and to engage in transactions prohibited by ERISA § 406(a)(1)(D).

123.    ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), prohibits a plan fiduciary from causing the plan to engage in a transaction that constitutes any furnishing of goods, services, or facilities between the plan and a party in interest to that plan.

124.    ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2), provides an exemption from the prohibitions of ERISA § 406(a), 29 U.S.C. § 1106(a) for services that are necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid for those services.

125.    The failure of HP and UAL to effectively initially evaluate and regularly monitor Fidelity's compensation in connection with its recordkeeping and trust services allowed Fidelity to derive excessive compensation for those services, and caused the HP and UAL Plans to engage in transactions prohibited by ERISA § 406(a)(1)(D), which caused the Plaintiffs and the HP and UAL Participant Class to suffer losses.

126.    Under ERISA §§ 409, 502(a)(2) and 502(a)(3), HP and UAL are liable to make good to the Plaintiffs and HP and UAL Participant Class members the damages sustained by them.

127.    Under ERISA § 502(a)(3), the Court should also award equitable relief to the Plaintiffs and Class members.

1

**PRAYER FOR RELIEF**

2

Wherefore, Plaintiffs pray for judgment as follows:

3

A.      Certify this action as a class action and appoint Plaintiffs' counsel as Class Counsel

4

pursuant to Federal Rule of Civil Procedure 23;

5

6

B.      Declare that Defendant has breached its fiduciary duties to the Plans and engaged in

7

prohibited transactions;

8

C.      Enjoin Defendant from further violations of its fiduciary responsibilities, obligations,

9

and duties and from further engaging in transactions prohibited by ERISA;

10

D.      Order that Defendant make good to the Plans the losses resulting from its serial

11

breaches of fiduciary duty;

12

13

E.      Order that Defendants disgorge any profits that it has made through breaches of

14

fiduciary duty and prohibited transactions and impose a constructive trust and/or equitable lien on

15

any funds received by Defendant therefrom;

16

F.      Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant

17

to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the common fund;

18

G.      Order Defendant to pay prejudgment interest; and

19

H.      Award such other and further relief as the Court deems equitable and just.

20

21

22

23

24

25

26

27

28

1    DATED this 18th day of August, 2016.

2

3                                           By:      /s/ Todd M. Schneider
4                                                   Todd M. Schneider – SBN 158253
                                                    Mark T. Johnson – SBN 76904
5                                                   Kyle G. Bates – SBN 299114
                                                    SCHNEIDER WALLACE COTTRELL
6                                                   KONECKY WOTKYNS LLP
                                                    2000 Powell Street, Suite 1400
7                                                   Emeryville, California  94608
                                                    Telephone: (415) 421-7100
8                                                   Facsimile: (415) 421-7105
                                                    tschneider@schneiderwallace.com
9                                                   mjohnson@schneiderwallace.com
                                                    kbates@schneiderwallace.com
10

11                                                  Garrett W. Wotkyns*
                                                    John J. Nestico*
12                                                  Michael C. McKay*
                                                    SCHNEIDER WALLACE COTTRELL
13                                                  KONECKY WOTKYNS LLP
                                                    8501 North Scottsdale Road, Suite 270
14                                                  Scottsdale, Arizona  85253
                                                    Telephone: (480) 428-0145
15                                                  Facsimile: (866) 505-8036
                                                    gwotkyns@schneiderwallace.com
16                                                  jnestico@schneiderwallace.com
                                                    mmckay@schneiderwallace.com

17                                                  *Pro Hac Vice application forthcoming

18                                                  *Attorneys for Plaintiff*

19

20

21

22

23

24

25

26

27

28