1   Todd M. Schneider (SBN 158253)
    Mark T. Johnson (SBN 76904)
2   Kyle G. Bates (SBN 299114)
    SCHNEIDER WALLACE
3   COTTRELL KONECKY
    WOTKYNS LLP
4   2000 Powell Street, Suite 1400
    Emeryville, California 94608
5   Telephone:  (415) 421-7100
    Facsimile:  (415) 421-7105
6   tschneider@schneiderwallace.com
    mjohnson@schneiderwallace.com
7   kbates@schneiderwallace.com

8
    *Attorneys for Plaintiffs*
9

10

11                  **UNITED STATES DISTRICT COURT**

12                **NORTHERN DISTRICT OF CALIFORNIA**

13                      **SAN JOSE DIVISION**

14
    MARK BURGESS, RHONDA JOHNSON,          Case No.: 5:16-cv-04784-LHK
15  LARRY LOPEZ, HOLGER MEYER, and
    ALAN B. MUNNS, on their own behalf as   **FIRST AMENDED COMPLAINT**
16  participants in certain ERISA covered pension
    plans and on behalf of a class of those similarly   **CLASS ACTION (ERISA)**
17  situated;

18              Plaintiffs,

19                  v.

20  HP INC., FIDELITY MANAGEMENT TRUST
    COMPANY, UNITED AIRLINES, INC., and
21  JOHN DOES 1-50.

22              Defendants.

23

24                  **PRELIMINARY STATEMENT**

25      1.      This action arises from the conduct of Defendant Fidelity Management Trust

26  Company ("FMTC" or "Fidelity"). In particular, while serving as a trustee and fiduciary for certain

27  retirement plans (including Plaintiffs' plans), Fidelity diverted for its own use cash assets Fidelity

28

received as trustee for the benefit of those retirement plans, reinvested or otherwise used that money for its own benefit, and kept the investment proceeds—called the "float income." This case also concerns the retirement plan administrators who allowed Fidelity to divert and retain the benefit from the plans' cash assets—the HP and UAL Defendants (defined below). Defendants' conduct violated the documents and agreements governing the plans and the relationship between Fidelity and those plans. It also violated Defendants' ERISA fiduciary duties.

2.      Significant amounts of cash move through ERISA covered retirement plans on a daily basis.  The cash has a variety of sources, including, among others, cash contributions, sales of investments such as interests in collective investment trusts and redemptions of mutual fund shares, revenue sharing payments from fund managers, repayment of participant loans, and interest earned on the cash. Plaintiffs' plans, for example, annually received cash contributions totaling hundreds of millions or even billions of dollars, and made cash distributions to participants of comparable amounts. Instead of ensuring that this cash was held in trust and managed exclusively for the benefit of the plans and their participants, Fidelity diverted the cash from the trusts, deposited the cash into accounts that it controlled, and used the cash for its own benefit. In effect, the cash Fidelity diverted for its own purposes became an interest free loan that Fidelity could draw on for its own benefit. Fidelity shared none of those benefits with the plans or their participants that Fidelity nominally served as trustee. Fidelity failed to disclose its diversion of the cash for its own benefit as required by its fiduciary duties and by applicable Department of Labor ("DOL") regulations, and indeed, as alleged in more detail below, took affirmative steps to conceal its practice of diverting the cash for its own benefit.

3.      Plaintiffs in this case are employees of HP Inc. ("HP"), and United Airlines, Inc. ("UAL"), and participants, respectively, in the Hewlett-Packard Company 401(k) Plan (the "HP Plan") and the United Airlines Ground Employee 401(k) Plan (the "UAL Ground Plan").

4.     The HP Plan and the UAL Ground Plan are "employee pension benefit plans" as defined in ERISA § 3(2)(A), *codified at* 29 U.S.C. § 1002(2)(A) that are designed to provide retirement income to the employee participants. In addition, the HP Plan and the UAL Ground Plans are "defined contribution plans" and "individual account plans" which provide retirement benefits "based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses… which may be allocated to such participant's account." ERISA § 3(34), *codified at* 29 USC § 1002(34). Thus unlike traditional defined benefit pensions, in defined contribution plans (like the HP Plan or UAL Ground Plan), the amount of retirement savings that participants (such as Plaintiffs) receive at retirement is simply a matter of how much is in their individual accounts at the time—contributions, less fees, plus any investment returns. Both the HP Plan and the UAL Ground Plans allow participants to have a portion of their wages contributed to the plan on their behalf and to receive matching employer contributions.  For calendar year 2015, 70% of total contributions to the UAL Ground Plan were deducted from employee wages.

5.     For calendar year 2012, the HP Plan received cash contributions of more than $1 billion and approximately $20 million in participant loan repayments, as reported on the its annual report (Form 5500).  Additionally, according to the annual report, during 2012 the HP Plan made "[b]enefit payment and payments to provide benefits: . . . [d]irectly to participants or beneficiaries, including direct rollovers" in excess of $1.9 billion. Fidelity served as the trustee for the HP Plan at all relevant times until January 2, 2013.

6.     The UAL Ground Plan is invested through a Master Trust arrangement. All of the assets of the UAL Ground Plan, along with all the assets of the United Airlines Flight Attendant 401(k) Plan (the "Flight Attendant Plan") and the United Airlines Management and Administrative 401(k) Plan (the "Admin Plan") (collectively, the "UAL Plans") are held in the United Airlines, Inc.

401(k) Plans Master Trust (the "UAL Master Trust"). At all relevant times, Fidelity served (and continues to serve) as the trustee for the UAL Master Trust.

7.     For calendar year 2012, the UAL Master Trust received cash contributions of $255 million as reported on the UAL Plans' annual report (Form 5500).  Additionally, according to the annual report, during 2012 the Master Trust made "[b]enefit payment and payments to provide benefits: . . . [d]irectly to participants or beneficiaries, including direct rollovers" of $314 million.

8.     Participants in both the HP Plan and the UAL Plans have the opportunity to allocate their existing account balances among the available investment options offered in those retirement plans.  They also have the opportunity to designate how their current and future contributions and current and future matching contributions will be invested.

9.     Plan participants have the right to take certain withdrawals from the HP and UAL Plans while they are employed and after termination of employment, and to borrow from their accounts.  Withdrawals can take the form of hardship withdrawals, in-service distributions, participant loans and lump-sum distributions at retirement or termination of employment.

10.    Withdrawals, loans and distributions are generally made in cash and require that all or a portion of a participant's investments be converted to cash.

11.    A significant percentage of those withdrawals, loans and distributions are made by check.  Withdrawals, distributions and loans are also made by electronic funds transfers ("EFT").

12.    In large plans like the HP Plan and the UAL Master Trust, there are hundreds if not thousands of such transactions occurring on a daily basis that require a transfer of cash, including incoming contributions used to purchase securities, transfers to investment funds in settlement of purchase transactions, cash received from investment funds for the sale or redemption of securities, withdrawals, redemptions and payments to service providers. Each plan maintains a cash management account or accounts through which all of these cash transactions are processed.

13.     ERISA imposes strict fiduciary duties of prudence and loyalty on those who exercise discretionary authority or control over ERISA plans and on anyone who exercises any authority or control with respect to the management or disposition of plan assets. ERISA §§ 3(21) & 404(a), 29 U.S.C. §§ 1002(21) & 1104(a).

14.     Under ERISA and related trust law, all of the cash contributed to a plan, including employer and employee contributions and participant loan repayments, belongs to the plan under ordinary notions of property rights and should be held in trust for the benefit of the plan. In addition, all of the other cash received by the plan as part of its ordinary operations—such as through liquidation of plan assets to satisfy a participant withdrawal or redemption request—belongs to the plan. These cash assets are therefore "plan assets" under ERISA § 3(42), 29 U.S.C. § 1002(42) (and the regulations thereunder) not later than the date those cash contributions are delivered to or received by the plan's trustee.

15.     Fidelity was the trustee and fiduciary of the HP and UAL Plans. In those roles, Fidelity was responsible for managing and disposing of the assets of those plans, including their cash. In those roles, Fidelity was subject to ERISA's strict duties of prudence and loyalty, which required Fidelity to carry out its responsibilities "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." ERISA § 404(a). As such, ERISA requires that the decisions of plan fiduciaries "must be made with *an eye single to the interests of the participants and beneficiaries.*" *Pilkington PLC v. Perelman*, 72 F.3d 1396 (9th Cir. 1995). ERISA's fiduciary duties are the "'highest known to the law.'" *Johnson v. Couturier*, 572 F. 3d 1067, 1077 (9th Cir. 2007) (quoting *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996)).

16.     But Fidelity has failed to satisfy its strict fiduciary responsibilities with respect to the HP and UAL Plans' cash. Instead of ensuring that all benefits from the cash flowed to the plans or

the participants, Fidelity effectively withdrew the cash from the HP and UAL Plans, and placed it into a different account from which it cleared the various cash transactions. Fidelity withdrew this money on an ongoing basis, and then reinvested it, using the proceeds—the float income–for itself. Because large amounts of cash steadily flowed into the HP and UAL Plans, Fidelity was able to maintain a steady balance in its own account for profitable reinvestment or other use. In fact, there was no reason for Fidelity to ever take possession of the HP and UAL Plans' cash in the first instance. All of the transactions that Fidelity executed through the cash account it set up to benefit itself could have been cleared through the cash management accounts or other similar accounts set up for the benefit of the Plans and the participants just as efficiently.

17.    Thus Fidelity has not fulfilled its fiduciary functions with an "eye single" to providing retirement benefits for the plans and their participants. Instead, Fidelity has flagrantly and intentionally disregarded its position of trust and responsibility over the HP and UAL Plans in order to line its own pockets. On information and belief, Fidelity's conduct is ongoing with respect to the UAL Plans, where it continues to serve as trustee.

18.    The HP and UAL Defendants were also fiduciaries for the HP and UAL Plans, respectively, and were or should have investigated, learned of and put a stop to been aware of Fidelity's diversion of cash from the Plans and from its management of plan transactions. Moreover, the HP and UAL Defendants should have taken steps to prevent Fidelity from keeping the float income, and should have instead caused Fidelity to credit the float income to the HP and UAL Plans and/or the participants in those plans, or to otherwise reimburse the HP and UAL Plans for the use of billions of dollars in cash. But the HP and UAL Defendants did nothing to prevent Fidelity's misconduct. The failure of the HP and UAL Defendants amounted to a breach of the duty of prudence under ERISA § 404, 29 U.S.C. § 1104, as well as breach of their co-fiduciary duties under ERISA § 405, 29 U.S.C. § 1105.

19.     Plaintiffs bring this action on behalf of their own plans pursuant to ERISA §§ 502(a)(2) & 409, 29 U.S.C. §§ 1132(a)(2) and 1109, and for injunctive and other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). In addition, and as set forth in more detail below (*infra* ¶¶ 86-97), pursuant to Federal Rule of Civil Procedure 23 Plaintiffs bring this action on behalf of a class of similarly situated ERISA plans subject to Fidelity's practice of diverting cash that should have been retained in trust to or for its own use and benefit (the "Float Plans Class") as well as a class of similarly situated employee participants in the HP and UAL Plans (the "HP and UAL Plan Participants Class").

## THE PARTIES

20.     During the class period (defined below), Plaintiffs Mark Burgess, Holger Meyer, and Alan B. Munns have been participants, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the HP Plan. Burgess resides in Frisco, TX.  Meyer resides in Helena, MT.  Munns resides in Ft. Collins, CO.

21.     At all relevant times, Plaintiffs Rhonda Johnson and Larry Lopez have been participants in the UAL Ground Plan.  Lopez currently resides in Northglenn, CO and Johnson currently resides in Compton, CA.

22.     Defendant HP Inc. ("HP") is the plan sponsor, plan administrator and named fiduciary of the HP Plan.  HP is a Delaware corporation with its headquarters and principal place of business in Palo Alto, CA.

23.     Defendant United Airlines, Inc. ("UAL") is the plan sponsor, plan administrator and named fiduciary of the UAL Plans.  UAL is a Delaware corporation with its headquarters and principal place of business in Chicago, IL.

24.     John Doe Defendants 1-50 are other individual and institutional fiduciaries employed by HP or UAL to administer or manage the HP and UAL Plans, respectively, and who were

responsible for appointing or monitoring Fidelity in its role as trustee and fiduciary for their respective plans. As used herein, the terms "HP and UAL Defendants" includes John Doe Defendants 1-50. At this time, Plaintiffs are unaware of the identities of John Doe Defendants, and will seek to obtain that information in discovery and will seek leave to amend to add them individually once that information is obtained.

## JURISDICTION AND VENUE

25.     Plaintiffs bring this action pursuant to ERISA §§ 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(2), (3). This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because this action arises under the laws of the United States.

26.     The Court has specific personal jurisdiction over Defendant FMTC because it served as a trustee for the HP Plan which is administered in this district, and thus its conduct at issue in this case was specifically directed towards this district.

27.     The Court has general personal jurisdiction over Defendant HP because it is headquartered and has its principal place of business in this district. The Court also has specific personal jurisdiction over HP because it administered the HP Plan in this district.

28.     This Court has specific personal jurisdiction over the UAL Defendants because thousands of participants in the UAL Plans reside in California, including in this district thus, UAL's actions in managing the UAL Plans—which are at issue here—were taken intentionally targeting UAL's operations and employees in California.

29.     Venue lies in the Northern District of California pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Defendant HP resides within or may be found in this District, the HP Plan is administered in this District, and/or the alleged breaches of the duties imposed by ERISA took place in this District.

**FIDELITY'S FIDUCIARY STATUS**

30.     Anyone who "exercises any discretionary authority or discretionary control respecting management of [a] plan" or who "exercises any authority or control respecting management or disposition of its assets" is a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus ERISA "commodiously impose[s] fiduciary standards on persons whose actions affect the amount of benefits retirement plan participants will receive." *John Hancock Mut. Life Ins. Co. v. Harris Trust and Sav. Bank*, 510 U.S. 86, 96 (1993).

31.     ERISA also requires that "all assets of an employee benefit plan shall be held in trust by one or more trustees" and that "the trustee or trustees shall have exclusive authority and discretion to manage and control the assets of the plan." ERISA § 403(a), 29 U.S.C. § 1103(a). Thus by definition, all ERISA plan trustees are fiduciaries for purposes of ERISA § 3(21)(A).

32.     Defendant Fidelity was a fiduciary of the UAL Plans, the HP Plan, and the plans in the Float Plans Class (the "Plans") for a number of related reasons.

33.     Fidelity was the trustee of the UAL Plans, was the trustee of the HP Plan until January 2, 2013 and is or was the trustee of the Float Plans Class (as defined below) for all or part of the relevant period. As trustee, Fidelity is or was a fiduciary to the Plans by definition.

34.     Pursuant to Section 2 of the Trust Agreement between HP and Fidelity (the "Trust Agreement"), "[t]he Trust shall consist of an initial contribution of money or other property, all investments made therewith ***and all proceeds thereof, and all earnings and profits thereof***, less payments that are made by the Trustee as provided herein." (emphasis added.) Fidelity was, therefore, made trustee—for the benefit of the HP Plan and its participants—over the "proceeds," "earnings" and "profits" from the assets it held in the for the HP Plan. On information and belief, the trust agreements between Fidelity and the other Plans were materially identical in this respect.

35.     Fidelity's duties as trustee include the allocation and administration of cash contributions and payments to the plans, effectuation of trades directed by plan participants, the withdrawal of cash from the Plans' trusts to settle purchases of securities, the receipt of the proceeds of redemptions of mutual fund shares and the sales of other securities on behalf of the Plans as the Plans' trustee, and the deposit of those proceeds into trust for the exclusive benefit of the Plans' participants.  The services Fidelity provides thus involve the grant to and/or exercise of control by Fidelity over the management of the significant cash flows into, through and out of the Plans. Fidelity's role in managing and distributing that cash to participants amounted to the exercise of "authority or control respecting management or disposition of [Plan] assets," rendering Fidelity a fiduciary under ERISA § 3(21)(A)(i).

36.     Put another way, under the HP Plan, all investments (such mutual fund shares) that are allocated to the accounts of plan participants are held by Fidelity as trustee in the name of the HP Plan itself. That is analogous to a common law trust, where the trustee holds legal title to trust assets, and the trust beneficiaries hold the beneficial (or equitable) title. When investments are sold—for example, to satisfy withdrawals, rollovers, or to fund participant loans—Fidelity liquidates the investments and records the proceeds as cash assets of the Plans and their trusts. Thus the proceeds from the sales of the investments are paid to Fidelity as trustee for the benefit of the HP Plan, and then distributed to the participants according to the terms of the HP Plan. The HP Plan's books record each of these purchases and sales of mutual fund shares, receipts and disbursements of cash, and the subsequent distributions to plan participants, as transactions involving plan assets. In those transactions, Fidelity is not merely acting as an intermediary, but is actively managing and disposing of plan assets as trustee. It is during that process, prior to the cash being actually transferred to the participants, that Fidelity diverts the cash to its own account and for its own benefit. The mutual funds have no idea of the identity of the individual participants that may own shares of the mutual funds in

their HP Plan accounts. At most, the mutual funds know only that the HP Plan has purchased shares. Thus when Fidelity, acting on behalf of the HP Plan, liquidates shares of mutual funds to satisfy participant transfer requests, the proceeds are paid to Fidelity as trustee of the HP Plan. Nor would any mutual fund have any knowledge of the expected use of the cash delivered to the Trustee—whether it is intended, for example, to pay benefits to a participant or to acquire other securities as a result of a participant's investment changes.[1]  Thus, under no circumstances do the mutual funds pay the participants directly, or pay Fidelity simply as a transactional intermediary on behalf of the participants, except insofar as Fidelity is a trustee of and fiduciary for the Plans.

37.     Moreover, Fidelity's services include administration and control over the mechanics of the Plans' core benefits processes—obtaining new contributions, allocating and reallocating contributions among different investment sources, liquidating investments and distributing benefits in the form of cash withdrawals or rollovers. For example, Fidelity acted as an intermediary on behalf of the Plans in the participant withdrawal process in accordance with its trust agreements with the Plans. In short, in its ordinary capacity as trustee, Fidelity was responsible for managing and administering the operation of almost every facet of the Plans, operations which gave Fidelity access to and control over significant and steady flows of cash. As such, Fidelity "exercise[d] … discretionary authority or discretionary control respecting management" of the Plans themselves, which is an independent basis for Fidelity's fiduciary status under ERISA § 3(21)(A)(i).

38.     In addition, Fidelity's diversion of cash that is at the heart of this case is a third independent basis for Fidelity's fiduciary status under ERISA § 3(21)(A)(i). Essentially, regardless

---

[1] Additionally, since the redemption of a mutual fund share represents the satisfaction of the mutual fund's legal obligation to a shareholder by the transfer of cash to the shareholder in exchange for the all of the shareholder's interest in the mutual fund, the relationship between the mutual fund and the shareholder has been extinguished and the mutual fund has no interest in the cash delivered to the shareholder.

of whether Fidelity's management of the cash moving through the Plans was discretionary in general, and regardless of whether the cash in question was a "plan asset," Fidelity exercised discretionary authority and control over the Plans when it used its control over Plan transactions and plan operations to divert cash for its own benefit. By diverting cash for its own benefit as part of its routine performance of its administrative functions for the Plans, Fidelity "exercised discretionary authority" and "discretionary control" over the management of the Plans under ERISA § 3(21)(A)(i). Fidelity was therefore a fiduciary with respect to its misconduct at issue in this action.

39.     On information and belief, Fidelity performed precisely the same role with respect to the other Plans.

## FIDELITY'S VIOLATIONS OF ERISA

40.     Fidelity diverted essentially all of the cash moving into, through or out of the Plans or being paid to Plan participants to a separate account or accounts that it established for its own benefit. The diverted cash included unallocated cash contributions and receipts as well as undistributed proceeds from the redemption of mutual fund shares.

41.     On information and belief, no express agreement existed authorizing Fidelity to divert the cash for its own benefit from the Plans or its management of Plan transactions in this way.

42.     In fact, Section 3 of the HP Plans' Trust Agreement with Fidelity provides that "[e]xcept as provided by applicable law, no part of the Trust may be used for, *or diverted to*, purposes other than the exclusive benefit of the Participants in the Plan or their beneficiaries or the reasonable expenses of Plan Administration." (emphasis added.) On information and belief, the trust agreements between Fidelity and the other Plans were materially identical in this regard.

43.     Moreover, on information and belief, no other fiduciary for the Plans impliedly authorized or otherwise directed Fidelity to divert the Plans' cash in this way.

44.     There is, as such, no justification for Fidelity to transfer the Plans' cash assets out of trust and into an account managed for its own benefit. But that is precisely what Fidelity did, and it reaped significant benefits for itself as a result. Fidelity's diversion of cash from the Plans and from transactions involving the Plans and their participants can only be characterized as either simply as the conversion of Plan assets by or for the benefit of Fidelity, the Plans' trustee, or an interest-free loan from the Plans and their participants to Fidelity.

45.     Fidelity's self-dealing violated numerous ERISA provisions.

46.     ERISA imposes strict fiduciary duties on those whose conduct can impact the amount of benefits plan participants receive. Among others duties, retirement plan fiduciaries are required to fulfill their functions prudently and loyally, and in accordance with the documents and instruments governing the plans, but only insofar as those documents and instruments are consistent with ERISA. ERISA § 404(a)(1)(A), (B) & (D), 29 U.S.C. § 1104(a)(1)(A), (B) & (D). As noted above, the Ninth Circuit has explained that ERISA's fiduciary duties are the "highest known to the law." *Johnson*, 572 F. 3d at 1077. Fidelity's self-dealing at issue here violated each of these duties.

47.     ***Violation of the duty of loyalty, ERISA § 404(a)(1)(A).*** ERISA imposes a duty of loyalty on plan fiduciaries. In particular, "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." ERISA § 404, 29 U.S.C. § 1104(a)(1)(A).   Fidelity flagrantly and intentionally violated its duty of loyalty by diverting money from the Plans and from Plan transactions for its own benefit.

48.     ***Violation of the duty of prudence, ERISA § 404(a)(1)(B).*** ERISA also requires plan fiduciaries to fulfill their duties with "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use

in the conduct of an enterprise of a like character and with like aims." The aim of the Plans was to provide retirement income to the participants. No careful, skillful, prudent or diligent fiduciary in Fidelity's capacity would have permitted Fidelity's massive diversion of cash for its own benefit, with no corresponding benefit for the Plans. Fidelity therefore violated the duty of prudence.

49.   ***Violation of the duty of adherence to plan documents, ERISA § 404(a)(1)(D).*** In addition, Fidelity was required to fulfill its fiduciary functions for the plans "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]." ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). As alleged above, Section 3 of the HP Plans' Trust Agreement with Fidelity provides that "Except as provided by applicable law, no part of the Trust may be used for, ***or diverted to***, purposes other than the exclusive benefit of the Participants in the Plan or their beneficiaries or the reasonable expenses of Plan Administration." (emphasis added.) Fidelity diverted part of the Trust – namely, the cash contributions to the Plans and the proceeds of the sale of the Plans' investments – for a purpose other than the exclusive benefit of the Plans or participants in the Plans.  In fact, the diversion had no purpose other than to benefit Fidelity.  Thus, Fidelity also violated the documents and instruments governing the Plans.

50.   ERISA also categorically prohibits certain transactions that are particularly likely to injure plans.

51.   ***Prohibited party-in-interest transaction, ERISA § 406(a).*** ERISA § 406(a), 29 U.S.C. § 1106(a), prohibits various transactions between plans and "parties in interest." ERISA defines parties in interest to include "any fiduciary" as well as any "person providing services to such plan." ERISA § 3(14)(A) & (B), 29 U.S.C. § 1002(14)(A) & (B). Fidelity was both a fiduciary for the Plans and provided services to the Plans, and was therefore a party in interest with respect to the Plans. Fidelity's diversion of cash from the Plans and participants to itself amounted to a "sale or exchange,

or leasing, of any property between the plan and a party in interest;" a "lending of money or other extension of credit between the plan and a party in interest;" a "furnishing of goods, services, or facilities between the plan and a party in interest;" and/or a "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." Fidelity's diversion of cash was therefore a prohibited transaction under ERISA § 406(a)(1)(A), (B), (C) & (D), 29 U.S.C. § 1106(a)(1)(A), (B), (C) & (D).

52. Once an ERISA plaintiff has shown that a transaction is prohibited by ERISA § 406(a), the burden shifts to the defendant to establish that one of the exemptions or safe harbors in ERISA § 408, 29 U.S.C. § 1108 applies. *Howard v. Shay*, 100 F. 3d 1484, 1488-89 (9th Cir. 1996). Because proving the applicability of ERISA § 408 is an affirmative defense, ERISA plaintiffs have no obligation to allege facts that would show that ERISA § 408 does not apply. *Allen v. Greatbanc Trust Co.*, No. 15-3569, 2016 WL 4474730 at *3-4 (7th Cir. Aug. 25, 2016) ("[A]n ERISA plaintiff need not plead the absence of exemptions to prohibited transactions. It is the defendant who bears the burden of proving a section 408 exemption … and the burden of pleading commonly precedes the burden of persuasion."). Nevertheless, and without suggesting that Plaintiffs have any obligation to plead or prove facts showing that ERISA § 408 does not apply, and without in any way relieving Defendants of their burden of proof with respect to ERISA § 408, Plaintiffs affirmatively allege that none of the safe harbors or exemptions set forth in ERISA § 408 apply to Fidelity's conduct alleged herein.

53. ***Prohibited self-dealing transaction, ERISA § 406(b).*** ERISA § 406(b), 29 U.S.C. § 1106(b),  prohibits a fiduciary from (i) "deal[ing] with the assets of the plan in his own interest or for his own account," (ii) "in his individual or in any other capacity act[ing] in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries," and (iii) "receiv[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction

involving the assets of the plan." Fidelity's diversion of cash as alleged herein was prohibited under each of these three definitions, and is thus prohibited under ERISA § 406(b). Many of the prohibited transaction exemptions provided by ERISA § 408, including the reasonable compensation safe harbor in § 408(c), do not apply to violations of ERISA § 406(b). *See, e.g., Patelco Credit Union v. Sahni*, 262 F.3d 897, 911 (9th Cir. 2001) ("The few cases that have considered the applicability of § 1108 to § 1106(b) are in accord that reasonable compensation does not apply to fiduciary self-dealing.").

54.     The US Department of Labor ("DOL") has made its position clear that the retention of "float" earned when a benefit check is issued to a participant constitutes prohibited self-dealing. See DOL Adv. Op. 93–24A (Sept. 13, 1993) ("[W]here a fiduciary (e.g. Trust Company) exercises discretion with regard to plan assets, its receipt of income from the 'float' on benefit checks under a repurchase agreement with a national bank in connection with the investment of such plan assets would result in a transaction described in ERISA section 406(b)(1).").

55.     The DOL reiterated its position in Field Assistance Bulletin 2002-3 (Nov. 5, 2002) (confirming the DOL's view that "a trustee's exercise of discretion to earn income for its own account from the float attributable to outstanding benefit checks constitutes prohibited self-dealing under section 406(b)(1) of ERISA.").

56.     Fidelity may contend that here it was a "directed trustee" pursuant to ERISA § 403(a)(1), 29 U.S.C. § 1103(a)(1) and that it was merely fulfilling directions that it received from the Plans' other fiduciaries when it diverted the cash. Alternatively, Fidelity may argue that it was simply adhering to some provision in the plan documents that effectively authorized its self-dealing. Neither contention would have merit under the circumstances.

57.     ERISA provides that plans may require trustees to follow the directions of other fiduciaries—so-called "directed trustees." ERISA § 403(a)(1), 29 U.S.C. § 1103(a)(1). However, the directed trustee may only follow a "proper" direction, and must not follow a direction that is not "in

accordance with the terms of the plan and which are not contrary to [ERISA]." *Id.* Thus "where a directed trustee knows that instructions of a named fiduciary are contrary to ERISA and, despite that knowledge follows the instructions nonetheless, he does so at his own peril, and the statute will not absolve him of liability." *Solis v. Webb*, 931 F. Supp. 2d 936, 950 (N.D. Cal. 2012).

58.     Even if Fidelity had received a direction to divert Plan cash or cash from Plan transactions for its own benefit, directed trustees may not follow directions that they know, or should know, violate ERISA or the terms of the plan. As alleged above, Fidelity's diversion of the cash at issue here violated ERISA's fiduciary duty provisions, ERISA's prohibited transaction rules and the terms of the Plans. Fidelity knew or should have known that its conduct violated these provisions of ERISA and plan documents. Numerous courts adjudicating ERISA claims against Fidelity have concluded that Fidelity could not escape liability by pointing to its status as a directed trustee on precisely those grounds.   *See Kling v. Fid. Mgmt. Trust Co.,* 270 F. Supp. 2d 121, 128–32 (D.Mass.2003) ("Because Kling has alleged facts which, if proven, could lead a reasonable jury to conclude that Fidelity had followed directions that it knew to be contrary to the Plan or to ERISA, the motion to dismiss is DENIED."); *In re Sprint Corp. ERISA Litig.*, 388 F. Supp. 2d 1207, 1235-38 (D. Kan. 2004) ("Because plaintiffs have alleged facts which, if proven, could lead a reasonable jury to conclude that Fidelity followed directions that it knew to be contrary to ERISA, Fidelity's motion to dismiss is denied."). Thus even if Fidelity was a directed trustee, and even if Fidelity received a direction to divert the cash and retain the float, Fidelity knew or should have known that following such a direction violated the duties of prudence and loyalty was inconsistent with the plan documents.

59.     Additionally, even if there were a plan document that purported to authorize Fidelity to divert cash for its own benefit while providing no benefit to the Plans and their participants (and putting aside for a moment the conflict such a document would create with section 3 of the Trust Agreement, which prohibited diversion of plan assets for any purpose other than to benefit the Plans

and their participants, *see* ¶ 42, *supra*), ERISA fiduciaries have an obligation to disobey and disregard plan documents or commends from the settlors of retirement trusts that are contrary to ERISA. *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2468-69 (2014) ( "[T]he duty of prudence trumps the instructions of a plan document, such as an instruction to invest exclusively in employer stock even if financial goals demand the contrary."). Any plan document authorizing Fidelity to divert cash for its own unlimited benefit, with no corresponding benefit for the Plans, patently violates ERISA's duties of prudence and loyalty and ERISA's prohibited transaction rules. Fidelity would have been, as such, obligated to disobey any document authorizing such misconduct in the event one exists or existed.

60.     As a result of Fidelity's breaches of its fiduciary duties and prohibited transactions described here, over the relevant period, the Plans have lost millions of dollars from the diversion of plan assets that would otherwise have been used to provide benefits to participants as earnings of the Plans' Trusts.

### FIDELITY'S FAILURE TO DISCLOSE AND CONCEALMENT OF ITS DIVERSION OF CASH FOR ITS OWN BENEFIT

61.     Applicable statutes of limitation here are tolled as a result of Fidelity's specific acts of fraud and/or concealment with respect to its wrongful taking of float income from retirement plan investors such as Plaintiffs and the Class.

62.     Regulatory regimes require Fidelity to disclose key details concerning its receipt of float income.  But Fidelity has failed so to disclose. Moreover, Fidelity has persistently and repeatedly taken action actively to conceal its diversion of the cash, as well as the amount of income received or other benefits obtained from that diversion.

63.     As early as 2002, the DOL explicitly described that disclosure obligation in Field Assistance Bulletin 2002-3 (Nov. 5, 2002):

---

The primary issue for service providers with float arrangements is whether the provider has disclosed to its employee benefit plan customers sufficient information concerning the administration of its accounts holding float so that the customer can reasonably approve the arrangement based on an understanding of the service provider's compensation.

\*       \*       \*

[T]he service provider can avoid self-dealing with respect to such earnings by taking the following steps:

1. Disclose the specific circumstances under which float will be earned and retained.
2. In the case of float on contributions pending investment direction, establish, disclose and adhere to specific time frames within which cash pending investment direction will be invested following direction from the plan fiduciary, as well as any exceptions that might apply.
3. In the case of float on distributions, disclose when the float period commences (e.g., the date check is requested, the date the check is written, the date the check is mailed) and ends (the date on which the check is presented for payment). Also disclose, and adhere to, time frames for mailing and any other administrative practices that might affect the duration of the float period.
4. Disclose the rate of the float or the specific manner in which such rate will be determined. For example, earnings on cash pending investment and earnings on uncashed checks are generally at a money market interest rate.

We note that the disclosure of and adherence to the foregoing by service providers will not only reduce the likelihood of prohibited self-dealing, but also will assist plan fiduciaries in discharging their obligations under sections 404(a)(1), 406 and 408(b)(2).

*Id.* at 2.

64.    In addition, ERISA § 103(c), 29 U.S.C. § 1023(c), requires employee benefit plans to file an annual return with the DOL, which must include, among other things,

the name of each person (including but not limited to, any consultant, broker, trustee, accountant, insurance carrier, actuary, administrator, investment manager, or custodian who rendered services to the plan or who had transactions with the plan) who received ***directly or indirectly*** compensation from the plan during the preceding year for services rendered to the plan or its participants, ***the amount of such compensation, the nature of his services to the plan or its participants,*** his relationship to the employer of the employees covered by the plan, or the employee organization, and any other office, position, or employment he holds with any party in interest.

65.     That language was interpreted by the DOL in 2005 in the context of compensation being received by the agents of insurance companies selling policies to employee benefit plans, stating that compensation being reported must include:

> commissions and fees required to be reported on Schedule A include all commissions and fees directly or indirectly attributable to a contract or policy between a plan and an insurance company, insurance service, or similar organization. This includes commissions and fees paid by an insurance company where . . . eligibility for the payment or the amount of the payment is based, in whole or in part, on the value (e.g., policy amounts, premiums) of contracts or policies (or classes thereof) placed with or retained by an ERISA plan, including, for example, persistency and profitability bonuses. . . . Further, nonmonetary forms of compensation, such as prizes, trips, cruises, gifts or gift certificates, club memberships, vehicle leases, and stock awards, must be reported if the entitlement to or the amount of the compensation was based, in whole or in part, on policies or contracts placed with or retained by ERISA plans. [2]

66.     Fidelity knew or should have known, with the publication of that Advisory Opinion that the rules for filing the annual return for an employee benefit plan required disclosure of float income derived from cash contributions to retirement plans and cash received by retirement plans from the sale of mutual fund shares held by the Plans and their participants.

67.     If there was any doubt at all about required disclosures regarding float, they were put to rest with the publication of final regulations governing information that must be disclosed on the Plans' Annual Return, *Annual Reporting and Disclosure; Revision of Annual Information Return/ Reports; Final Rule and Notice*, 72 Fed. Reg. 221. The Preamble to that regulation states that "Reportable compensation under the final Schedule C revisions continues to be defined to include money and any other thing of value (for example, gifts, awards, trips) received directly or indirectly from the plan (including fees charged as a percentage of assets and deducted from investment returns) for services rendered to the plan."

68.     More explicitly, the Preamble provides, with respect to bundled service arrangements such as the Plans' arrangements with Fidelity:

---

[2] Advisory Opinion 2005-02A (February 24, 2005).

> In the case of such bundled arrangements, . . . any person in the bundle who is a fiduciary to the plan or provides one or more of the following services to the plan contract administrator, consulting, investment advisory (plan or participants), investment management, securities brokerage, or recordkeeping—receiving amounts as . . . *float revenue,* or transaction-based charges (e.g., brokerage commissions) *must be separately reported on the Schedule C if their total reportable compensation equals or exceeds $5,000.*

72 Fed. Reg. 221 at 64741 (November 16, 2007).

69.     Notwithstanding this very clear direction from the Department of Labor, none of the Annual Returns for the United Airlines Plans or the HP Plans filed over a period of years and examined in connection with the preparation of this Complaint contain any disclosure regarding float income.

70.     Furthermore, a former Fidelity employee contacted Plaintiffs' counsel. He revealed that Fidelity since at least the mid-1990's actively has taken identifiable steps to conceal its wrongful taking of float income from its client retirement plans and their investors, including but not limited to Plaintiffs and members of the Class. (*See* Declaration of Duane Napier (attached hereto as Exhibit A).) Among other things, Fidelity hid the fact that the cash it diverted for its own use even existed. Fidelity also trained its employees to lie about the monies that are at issue in this case.  These steps included but were not limited to punishing Fidelity employees that took steps to reveal and remedy Fidelity's wrongful appropriation of its' retirement investors' float income. And Fidelity threatened at least one employee with termination if the employee ever mentioned to anyone the practices that are the subject of this complaint.

71.     And uncontroverted evidence at trial in a related case showed that, until at least well into 2010, Fidelity did not otherwise disclose anything material to its retirement plan investors (such as Plaintiffs) concerning its unwarranted diversion of their retirement monies for its own benefit.  (*See* Transcript of Bench Trial, *Tussey v. ABB, Inc.*, No. 06-04305-CV-C-NKL, at 1177-1179 (W.D. Mo. January 11, 2010) (Fidelity witness defining "float income," stating that after a diligent search it found nothing showing Fidelity ever communicated anything about its float income-taking practices

with the administrator of the ABB PRISM retirement plans, and also stating in response to the question that "the ABB PRISM Plans are handled [by Fidelity] the same way as your other large contribution [retirement] plans are handled, correct?" that that is true "[f]or the entire [Fidelity client plan] population, which is not just large plans, but it's all plans").

72.    As an ERISA fiduciary, Fidelity owed fiduciary duties to fairly and accurately disclose the nature and extent of its activities in managing the Plans and the Plans' assets, including the nature, extent and sources of any fees it was collecting. Fidelity's failure to disclose and active concealment of that information violated those fiduciary duties as well as the particular DOL regulations cited above.

73.    Given Fidelity's failure to disclose the existence (to say nothing of the extent) of its diversion of cash for its own benefit, and in light of its affirmative steps to conceal these practices, no plan participant could reasonably have discovered Fidelity's fiduciary breaches or prohibited transactions. So otherwise applicable ERISA limitations periods that would apply to the claims of Plaintiffs and the Class are tolled on account of Fidelity's fraud and concealment of the conduct at issue here.

**UNITED'S AND HP'S FIDUCIARY OBLIGATIONS AND BREACHES**

74.    On information and belief, the HP and UAL Defendants are the Plan Administrators and named fiduciaries of the HP Plan and the UAL Plans, respectively.

75.    As named fiduciaries to the HP and UAL Plans, the HP and UAL Defendants are obligated to deal with the assets of the Plans subject to the "duty of loyalty" and a "duty of prudence" imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).

76.    The duty of prudence imposes a very high standard of care and has been described as a "prudent expert" requirement.  It requires an investigation of the merits of any proposed use or disposition of Plan assets, including the hiring of any service provider and a thorough understanding

of the fees being paid for the service being provided, which includes any direct or indirect compensation to be received by the service provider.  Having a prudent process for decision making is a key factor in satisfying the duty of prudence. In addition, the duty of prudence requires fiduciaries to maintain a periodic review of fiduciary decisions, including selection of service providers and investment options, to ensure that the decisions remain in the best interests of the Plans and their participants.

77.     As explained above, the duty of loyalty requires Plan fiduciaries to act solely in the interests of the Plan and its participants and beneficiaries when making decisions regarding the use or disposition of plan assets, as well as in connection with contracting for services.

78.     The HP and UAL Defendants failed to undertake a reasonably thorough investigation of Fidelity's actions and compensation with respect to its management of the Plans and control over assets of the Plans. Even after the initial selection of Fidelity, the HP and UAL Defendants failed to monitor and supervise Fidelity in connection with Fidelity's management and use of the Plans' cash assets to the detriment of the Plans' participants. *See Tibble v. Edison International*, __ U.S. __, 135 S. Ct. 1823, 1828-29 (2015) (ERISA fiduciaries have "a continuing duty" to monitor investment decisions).  In addition, because of Fidelity's failure to provide sufficient information about the use of the Plans' cash assets and management of Plan transactions, the HP and UAL Defendants have *a fortiori* failed to obtain sufficient information from Fidelity to appropriately assess the amount of Fidelity's compensation in relation to the services being provided. For each of these reasons, the HP and UAL Defendants have violated the duty of prudence under ERISA § 404(a)(1)(B).

79.     In addition, ERISA § 405, 29 U.S.C. § 1105 renders a fiduciary liable for the breaches of his co-fiduciaries "if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach." The imprudent conduct of the HP and UAL

Defendants described above enabled Fidelity's imprudent and disloyal fiduciary breaches. Thus HP and the UAL Defendants violated their co-fiduciary duties under ERISA § 405(a).

80.    As plan fiduciaries, the HP and UAL Defendants are prohibited from causing the HP and UAL Plans from engaging in any 'party in interest transaction' prohibited by ERISA § 406(a) unless they bear the burden of establishing that the transaction is subject to an applicable exemption.

81.    For example, ERISA § 408(b)(2) provides an exemption for obtaining necessary services for a plan, including recordkeeping and brokerage services, provided that no more than "reasonable compensation" is paid for such services. As explained *supra* ¶ 52, Plaintiffs are under no obligation to plead facts to rebut the applicability of ERISA § 408(b)(2) or any other affirmative defense—Defendants bear the burden of pleading and proof to the extent they seek the protections of such a defense. Nevertheless, and without assuming Defendants' ultimate burden of proof on those issues, Plaintiffs affirmatively allege that the money made by Fidelity as a result of its illicit diversion of cash from the Plans and from Plan transactions far exceeded reasonable compensation for the services Fidelity provided.

82.    For many years, the DOL has provided guidance to plan fiduciaries regarding the performance of their obligations, including guidance regarding contracting for plan services:

> In selecting a service provider, plan fiduciaries must, consistent with the requirements of section 404(a), act prudently and solely in the interest of the plan's participants and beneficiaries and for the exclusive purpose of providing benefits and defraying reasonable expenses of administering the plan. Except as provided in section 408, plan fiduciaries also have an obligation under section 406(a) not to cause the plan to engage in certain transactions, including a direct or indirect furnishing of goods, services or facilities between the plan and a party in interest. Section 408(b)(2) exempts from the prohibitions of section 406(a) any contract or reasonable arrangement with a party in interest, including a fiduciary, for office space, or legal, accounting or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor.[2]  In carrying out these responsibilities, the Department has indicated that a plan fiduciary must engage in an objective process designed to elicit information necessary to assess the qualifications of the provider, the quality of services offered, and the reasonableness of the fees charged in light of the services provided.

1    DOL Field Assistance Bulletin 2002-3.

2        83.    DOL Field Assistance Bulletin 2002-3 states explicitly that "[t]he primary issue for

3    service providers with float arrangements is whether the provider has disclosed to its employee

4    benefit plan customers sufficient information concerning the administration of its accounts holding

5    float so that the customer can reasonably approve the arrangement based on an understanding of the

6    service provider's compensation."

7

8        84.    HP's and UAL's failure to obtain sufficient information from Fidelity to thoroughly

9    understand the nature and extent of Fidelity's compensation allowed Fidelity to conceal the amount

10   of its compensation and to continue to receive excessive compensation in relation to the services

11   provided for years, and resulted in a failure of the conditions required under ERISA § 408(b)(2) for

12   the transaction with Fidelity to be exempt from the prohibitions of ERISA § 406(a).

13

14       85.    The failure of the HP and UAL Defendants to obtain sufficient information about

15   Fidelity's compensation caused the HP and UAL Plans to engage in transactions with Fidelity, a party

16   in interest to the HP and UAL Plans, that are prohibited under ERISA § 406(a).

17                          **CLASS ACTION ALLEGATIONS**

18       86.    Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(1),

19   23(b)(2), or 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following classes of

20   similarly situated persons ("the Classes"):

21

22           a.    **The Float Plans Class:**  All defined contribution individual account plans within

23                the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), for which Fidelity

24                Management Trust Company or its affiliate served as Trustee and/or recordkeeper

25                and for which it had, or for which it exercised, authority to (A) withdraw assets

26                from the Plan's Trust in connection with the investment of Plan assets, prior to the

27                settlement date with respect to such investments; or (B) prepare and deliver

28

distribution, withdrawal  and/or loan checks and in connection therewith to withdraw funds from the Plan's trust and deposit those funds into an account or accounts held in the name of Fidelity or its affiliate or maintained by or for the use of Fidelity or its affiliate, at any time from the earlier of (i) six years before the filing of this action, or (ii), in the event the Court determines that Fidelity has concealed the facts and circumstances that would have apprised Plaintiffs and the Class of the existence of Fidelity's breach, the first date on which Fidelity commenced services as Trustee, and in either case, through the date of judgment (the "Float Plans Class Period").

b. **The HP and UAL Plan Participant Class:**  All individuals who were participants in either the HP Plan or the UAL Plans while Fidelity Management Trust Company or its affiliate served as Trustee and/or recordkeeper and for which it had, or for which it exercised, authority to: (A) withdraw assets from the HP and UAL Plans' Trusts in connection with the investment of Plan assets, prior to the settlement date with respect to such investments; or (B), prepare and deliver to participants distribution, withdrawal  and/or loan checks and in connection therewith to withdraw funds from the Plan's trust and in either case to deposit those funds into an account or accounts held in the name of Fidelity or its affiliate or maintained by or for the use of Fidelity or its affiliate, at any time from the earlier of (i) six years before the filing of this action, or (ii), in the event the Court determines that Fidelity has concealed the facts and circumstances that would have apprised Plaintiffs and the Class of the existence of Fidelity's breach, the first date on which Fidelity commenced services as Trustee, and in either case, through the date of judgment

87.    The members of the class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are, at a minimum, several thousands of members of the Class.[3]

88.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among such questions are:

  a.   Whether Fidelity was a fiduciary of the Plans;

  b.   Whether Fidelity breached its fiduciary duties with respect to the management of the Plans' cash assets received in trust as plan contributions and cash assets received in trust as a result of the liquidation of plan assets in connection with Plan distributions, loans and withdrawals;

  c.   Whether the Defendants breached their duty of loyalty by engaging in a process for the management of billions of dollars of plan cash assets that was designed to benefit Fidelity and not for the benefit of the Plans and their participants;

  d.   Whether the Defendants engaged in a prohibited transaction under ERISA § 406(a)(1) by causing the Plans to either (i) loan money or extend credit to Fidelity by providing Fidelity exclusive use and control of billions of dollars in cash that was held awaiting investment or held while distribution, withdrawal and loan transactions were pending, or (ii) by  transferring plan assets to an account

---

[3] Fidelity provides defined contribution, defined benefit, health and welfare and stock plan services to nearly 20,000 employers. *See* "Fidelity By The Numbers: Corporate Statistics," available at https://www.fidelity.com/about-fidelity/fidelity-by-numbers/corporate-statistics (last viewed Aug. 12, 2016.)

that was subject to Fidelity's exclusive control and managing those assets for its exclusive benefit;

    e.   Whether Fidelity breached its fiduciary duties by receiving excessive compensation in relation to the service provided;

    f.   Whether the Defendants' acts proximately caused losses to the Plans;

    g.   Whether the Class is entitled to damages and injunctive relief;

    h.   Whether Defendants' conduct is permitted based upon any prohibited transaction exemption or other authority.

89.    There are no substantial individual questions among the Class claims on the merits of this action.

90.    **Rule 23(b)(1)(A) & (B) Requirements.**  Class action status in this action is warranted under Rule 23(b)(1)(A), because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for the Defendants.  Class action status is also warranted under Rule 23(b)(1)(B), because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

91.    **Rule 23(b)(2) Requirements.**  Certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

92.    **Rule 23(b)(3) Requirements.**  Certification under Rule 23(b)(3) is also appropriate because common questions of law and fact clearly predominate over any questions affecting only individual members.  Fidelity's system for processing contributions, distributions and transfers was

the same for all of its plan clients.  Moreover, a class action is superior to the other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable.  Furthermore, because the injury suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

93. **Typicality.**  The Plaintiffs' claims are typical of the claims of the members of the Class because the Plaintiffs and members of the Class sustained injury arising out of the Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein. The Plaintiffs' claims are also typical of the claims of the members of the Class inasmuch as the Plaintiffs seek relief on behalf of the Plans pursuant to ERISA § 502(a)(2), and, thus, the Plaintiffs' claims on behalf of the Plans, participants and beneficiaries are not only typical of, but identical to, the claims of Class members.  If cases were brought and prosecuted individually, each member of the Class would be required to prove the same claims based upon the same facts, pursuant to the same remedial theories, and would be seeking the same relief.

94. Plaintiffs have been injured by the breaches of fiduciary duty alleged in this Complaint and are committed to fairly, adequately, and vigorously representing and protecting the interests of the members of the class.

95. Plaintiffs have retained counsel competent and experienced in class action litigation of this nature for this purpose.

96. Neither Plaintiffs nor their counsel have any interests that might cause them to refrain from vigorously pursuing the claims in this class action.  Thus, Plaintiffs are adequate representatives of the class.

97.     On information and belief, the names and addresses of the class members are available from Fidelity and/or the Plans, and adequate notice can be provided to members of the class to the extent required by Fed. R. Civ. P. 23.

## CLAIMS FOR RELIEF

98.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant to bring an action for relief under ERISA § 409.

99.     ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia,* that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of the fiduciary.

100.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), permits a plan participant to bring an action to obtain injunctive to enforce the provisions of ERISA or to enforce the terms of a plan or obtain other appropriate equitable relief to remedy violations of those provisions.

101.    Each of the claims below are brought pursuant to ERISA § 502(a)(2) and (3), except the Third Claim for Relief, which is brought exclusively pursuant to ERISA § 502(a)(3).

## FIRST CLAIM FOR RELIEF

**(Fidelity's Breaches of Fiduciary Duty Under ERISA § 404(a), 29 U.S.C. § 1104(a))**

102.    Plaintiffs incorporate each of the preceding paragraphs as if set forth fully herein.

103.    As set forth above, Fidelity was an ERISA fiduciary for the Plans.

104.    As set forth above, Fidelity breached its ERISA fiduciary duties of prudence, loyalty and obedience to plan documents by diverting Plan assets and assets in Plan transactions to itself as an interest free loan for its own benefit, and with no corresponding benefit to the Plans or their participants.

105.    Fidelity's breaches proximately caused the losses to the Plans in an amount to be determined at trial.

106.    Fidelity has profited from the fiduciary breaches alleged herein in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

### (Prohibited Transactions Under ERISA § 406(a) and (b), 29 U.S.C. § 1104(a) and (b) Caused By Fidelity)

107.    Plaintiffs incorporate each of the preceding paragraphs as if set forth fully herein.

108.    As alleged above, Fidelity's diversion of cash from the Plans and Plan transactions into accounts controlled by Fidelity for its own use and benefit, constitute prohibited transactions between a plan and a party in interest within the meaning of ERISA § 406(a), and amounted to self-dealing prohibited by ERISA § 406(b).

109.    Fidelity knew or should have known that these transactions constituted prohibited transactions under § 406(a) and (b).

110.    These prohibited transactions proximately caused losses to the Plans in an amount to be determined at trial.

111.    Fidelity has profited from the prohibited transactions alleged herein in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

### (Fidelity's Failures to Disclose and Concealment in Violation of ERISA § 404, 29 U.S.C. § 1104 and the regulations thereunder)

112.    Plaintiffs incorporate each of the preceding paragraphs as if set forth fully herein.

113.    Fidelity failed to disclose the nature and extent of its activities in managing the Plans and the Plans' assets, including its diversion of cash from the Plans and from Plan transactions,

thereby violating its fiduciary duties of prudence and loyalty as well as particular regulations promulgated by the Department of Labor.

114.   In addition, Fidelity's active concealment of information it had a duty to disclose was an independent violation of these duties.

115.   As a result of Fidelity's failure to satisfy its disclosure obligations and active concealment of such information, Plaintiff and the proposed Class have suffered from an inability properly to understand and enforce their rights and to manage their accounts.

## FOURTH CLAIM FOR RELIEF

### (HP & UAL Defendants' Breaches of Fiduciary Duty Under ERISA § 404(a), 29 U.S.C. § 1104(a) and Breaches of Co-Fiduciary Duty Under ERISA § 405)

116.   Plaintiffs incorporate each of the preceding paragraphs as if set forth fully herein.

117.   As set forth above, the HP and UAL Defendants were ERISA fiduciaries for the HP and UAL Plans and their participants and beneficiaries, including Plaintiffs.

118.   As set forth above, the HP and UAL Defendants violated their ERISA fiduciary duty of prudence by failing undertake a prudence fiduciary process with respect to the retention or monitoring of Fidelity, with respect to Fidelity's conduct as trustee, with respect to Fidelity's compensation, with respect to Fidelity's management and control over Plan assets and Plan transactions, and/or with respect to Fidelity's diversion of cash from the Plans and from Plan transactions for its own benefit.

119.   The HP and UAL Defendants' imprudent conduct in this regard permitted Fidelity's diversion of cash and enabled Fidelity's fiduciary breaches and prohibited transactions in violation of ERISA § 405.

120.   The HP and UAL Defendants' fiduciary and co-fiduciary breaches proximately caused losses to the Plaintiffs, the HP and UAL Plans, and the HP and UAL Plan Participant Class in an amount to be determined at trial.

121.    The HP and UAL Defendants should be required to disgorge any profit they obtained by their fiduciary and co-fiduciary breaches.

**FIFTH CLAIM FOR RELIEF**

**(Prohibited Transactions Under ERISA § 406(a) and (b), 29 U.S.C. § 1104(a) and (b) Caused by the HP and UAL Defendants)**

122.    Plaintiffs incorporate each of the preceding paragraphs as if set forth fully herein.

123.    As alleged above, Fidelity's diversion of cash for its own use and benefit was a prohibited transaction under ERISA § 406(a) and (b).

124.    As alleged above, the HP and UAL Defendants failed to stop Fidelity's self-dealing, thereby causing the HP and UAL Plans to engage in transactions prohibited by ERISA § 406(a) and (b).

125.    As a proximate result of these prohibited transactions, the Plans suffered losses in an amount to be determined at trial.

126.    The HP and UAL Defendants should be required to disgorge any profit they obtained by virtue of these prohibited transactions.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for judgment as follows:

A.    Certify this action as a class action and appoint Plaintiffs' counsel as Class Counsel pursuant to Federal Rule of Civil Procedure 23;

B.    Declare that Defendants have breached their fiduciary duties to the Plans and engaged in prohibited transactions;

C.    Enjoin Defendants from further violations of their fiduciary responsibilities, obligations, and duties and from further engaging in transactions prohibited by ERISA;

D.    Order that Defendants make good to the Plans the losses resulting from their serial breaches of fiduciary duty;

1       E.      Order that Defendants disgorge any profits that they have made through breaches of fiduciary duty and prohibited transactions and impose a constructive trust and/or equitable lien on any funds received by Defendants therefrom;

F.      Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the common fund;

G.      Order Defendants to pay prejudgment interest; and

H.      Award such other and further relief as the Court deems equitable and just.

DATED this 22nd day of September, 2016.


By:    */s/ Todd M. Schneider*
        Todd M. Schneider – SBN 158253
        Mark T. Johnson – SBN 76904
        Kyle G. Bates – SBN 299114
        SCHNEIDER WALLACE COTTRELL
        KONECKY WOTKYNS LLP
        2000 Powell Street, Suite 1400
        Emeryville, California  94608
        Telephone: (415) 421-7100
        Facsimile: (415) 421-7105
        tschneider@schneiderwallace.com
        mjohnson@schneiderwallace.com
        kbates@schneiderwallace.com


        Garrett W. Wotkyns*
        John J Nestico*
        Michael C. McKay*
        SCHNEIDER WALLACE COTTRELL
        KONECKY WOTKYNS LLP
        8501 North Scottsdale Road, Suite 270
        Scottsdale, Arizona  85253
        Telephone: (480) 428-0145
        Facsimile: (866) 505-8036
        gwotkyns@schneiderwallace.com
        jnestico@schneiderwallace.com
        mmckay@schneiderwallace.com

        *Pro Hac Vice application forthcoming

        *Attorneys for Plaintiff*

1

## **CERTIFICATE OF SERVICE**

2

3       I hereby certify that on, September 22, 2016, I electronically filed the foregoing with the

4   Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to

5   registered CM/ECF participants.

6

7                                                */s/ Kelle J. Winter*
                                                 Kelle J. Winter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28