1   RANDALL W. EDWARDS (S.B. #179053)
    redwards@omm.com
2   SUSANNAH K. HOWARD (S.B. #291326)
    showard@omm.com
3   ADAM M. KAPLAN (S.B. #298077)
    akaplan@omm.com
4   O'MELVENY & MYERS LLP
    Two Embarcadero Center, 28th Floor
5   San Francisco, CA  94111-3823
    Telephone:     (415) 984-8700
6   Facsimile:     (415) 984-8701

7   BRIAN D. BOYLE (S.B. #126576)
    bboyle@omm.com
8   O'MELVENY & MYERS LLP
    1625 Eye Street, NW
9   Washington, DC 20006
    Telephone:     (202) 383-5300
10  Facsimile:     (202) 383-5414

11  Attorneys for Defendant
    Fidelity Management Trust Company
12

13
14                  **UNITED STATES DISTRICT COURT**

                    **NORTHERN DISTRICT OF CALIFORNIA**
15

16  MARK BURGESS, RHONDA              Case No.  5:16-CV-04784-LHK
    JOHNSON, LARRY LOPEZ, HOLGER
17  MEYER, and ALAN B. MUNNS,         **DEFENDANT FIDELITY MANAGEMENT**
    individually, and on behalf of all others   **TRUST COMPANY'S NOTICE OF**
18  similarly situated,               **MOTION AND MOTION TO DISMISS**
                                      **FIRST AMENDED COMPLAINT;**
19                  Plaintiffs,       **MEMORANDUM OF POINTS AND**
                                      **AUTHORITIES IN SUPPORT THEREOF**
20         v.
                                      Hearing date:   December 22, 2016
21  HP INC., FIDELITY MANAGEMENT      Time:           1:30 p.m.
    TRUST COMPANY, UNITED             Judge:          Hon. Lucy H. Koh
22  AIRLINES, INC., and JOHN DOES 1-50.   Courtroom:      8

23                  Defendants.       First Am. Compl. Filed: Sept. 22, 2016

24
25
26
27
28
                                                    FIDELITY'S MOTION TO DISMISS FAC
                                                    CASE NO. 5:16-CV-04784-LHK

## NOTICE OF MOTION AND MOTION TO DISMISS

**TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

Please take notice that on December 22, 2016 at 1:30 p.m., or as soon thereafter as the matter may be heard, in the United States District Court, Northern District of California, San Jose Courthouse, located at 280 South 1st Street, Courtroom 8, before the Honorable Lucy H. Koh, Defendant Fidelity Management Trust Company ("Fidelity") will, and hereby does, move the Court for an order dismissing Claims I-III in Plaintiffs' First Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Specifically, Fidelity seeks an order:

(1) Dismissing Claim I for failure to state a claim for breach of fiduciary duties under ERISA § 404(a), 29 U.S.C. § 1104(a), because (A) float and float interest are not, nor sufficiently alleged to be, plan assets or otherwise the property of the Plans within the meaning of ERISA, and (B) Fidelity was not acting in a fiduciary capacity with respect to its float processes;

(2) Dismissing Claim II for failure to state a claim for "prohibited transactions" under ERISA § 406(a) & (b), 29 U.S.C. § 1106(a) & (b), because (A) the alleged diversion of float to accrue float interest did not involve "assets of the plan" or transactions with the Plans as is required to state a claim under this provision of ERISA, and (B) Fidelity was not acting in a fiduciary capacity with respect to its float processes;

(3) Dismissing Claim III for failure to state a claim for non-disclosure and concealment under ERISA § 404, 29 U.S.C. § 1104 and "the regulations thereunder," because Fidelity did not have any disclosure obligation where (A) float and float interest are not plan assets or otherwise the property of the Plans within the meaning of ERISA, and Fidelity was not acting in a fiduciary capacity with respect to such float and float interest, (B) Fidelity did not earn compensation from float or float interest net of bank fees, as is necessary to violate the regulations and guidance promulgated by the Department of Labor, and (C) Fidelity had no obligation to disclose that which the Plans already knew—*i.e.*, that the Plans were not receiving any float interest.

This Motion is based on the Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, Fidelity's Request for Judicial Notice and the supporting Declaration of Randall W. Edwards, the papers and records on file in this action, and such other

1  written and oral argument as may be presented to the Court.

2        Dated:  November 2, 2016        O'MELVENY & MYERS LLP

3

4                          By:  /s/ Randall W. Edwards
                              Randall W. Edwards

5                          Attorneys for Defendant
                        Fidelity Management Trust Company

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIDELITY'S MOTION TO DISMISS FAC
CASE NO. 5:16-CV-04784-LHK

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................ 1

II.    FACTUAL BACKGROUND ....................................................................... 3

    A.    401(k) Plans and Fidelity's "Float" Process ................................... 4

    B.    The History of the Float Claims and the First and Eighth Circuit Decisions .......... 7

        1.    The *Tussey* Trial and Eighth Circuit Decision ............................................. 7

        2.    The *Kelley* Litigation and Justice Souter's First Circuit Opinion ................ 8

    C.    The Operative Complaint ................................................................ 11

III.    LEGAL STANDARD .............................................................................. 12

IV.    ARGUMENT ........................................................................................... 13

    A.    Float and Float Interest Still Are Not "Plan Assets" Subject to ERISA As a Matter of Law .......................................................... 13

        1.    All Claims Depend on Plans' Entitlement to Float and Float Interest ....... 13

            a.    Fiduciary Breach Claim Under ERISA 29 U.S.C. § 1104 ............. 14

            b.    Prohibited Transaction Claim Under ERISA 29 U.S.C. § 1106 ........ 15

        2.    "Plan Asset" Is Determined by Ordinary Notions of Property Rights ....... 16

        3.    The Plans Have No Right to Depository Float ......................................... 16

        4.    The Plans Have No Right to Redemption Float........................................ 19

    B.    Plaintiffs Fail to Plausibly Allege a Fiduciary Breach........................ 21

    C.    Additional Problems Exist with Plaintiffs' Non-Disclosure Claim Based on DOL Guidance and Regulations ................................................ 23

V.    CONCLUSION ....................................................................................... 25

FIDELITY'S MOTION TO DISMISS FAC
CASE NO. 5:16-CV-04784-LHK

# <u>TABLE OF AUTHORITIES</u>

**Page**

<u>CASES</u>

*Acosta v. Pac. Enters.*,
   950 F.2d 611 (9th Cir. 1991) ............................................................................................ 16

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ......................................................................................................... 12

*Assocs. in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*,
   941 F.2d 561 (7th Cir. 1991) ............................................................................................ 18

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .................................................................................................... 12, 13

*Faber v. Metro. Life Ins. Co.*,
   648 F.3d 98 (2d Cir. 2011) ................................................................................... 16, 22, 23

*Fifth Third Bancorp. v. Dudenhoeffer*,
   134 S. Ct. 2459 (2014) ...................................................................................................... 13

*In re Fid. ERISA Float Litig.*,
   2015 WL 1061497 (D. Mass. Mar. 11, 2015) ............................................................ passim

*In re Fid. ERISA Float Litig.*,
   829 F.3d 55 (1st Cir. 2016) .......................................................................................... passim

*In re Yahoo Mail Litig.*,
   7 F. Supp. 3d 1016 (N.D. Cal. 2014) ................................................................................ 13

*Merrimon v. Unum Life Ins. Co.*,
   758 F.3d 46 (1st Cir. 2014) ............................................................................. 10, 21, 22, 24

*Robinson v. Life Ins. Co. of N. Am.*,
   2016 WL 2344195 (N.D. Cal. May 3, 2016) .................................................................... 22

*SEC v. Pentagon Capital Mgmt.*,
   844 F. Supp. 2d 377 (S.D.N.Y. 2012), *aff'd in relevant part*, 725 F.3d 279
   (2d Cir. 2013) .................................................................................................................... 17

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
   551 U.S. 308 (2007) .......................................................................................................... 13

*Tussey v. ABB, Inc.*,
   2007 WL 4289694 (W.D. Mo. Dec. 3, 2007) ..................................................................... 8

*Tussey v. ABB, Inc.*,
   2012 WL 1113291 (W.D. Mo. Mar. 31, 2012) ................................................................... 8

*Tussey v. ABB, Inc.*,
   746 F.3d 327 (8th Cir. 2014) ....................................................................................... passim

*US Airways, Inc. v. McCutchen*,
   133 S. Ct. 1537 (2013) ...................................................................................................... 22

FIDELITY'S MOTION TO DISMISS FAC
CASE NO. 5:16-CV-04784-LHK

*Vander Luitgaren v. Sun Life Assurance  Co.*,
    765 F.3d 59 (1st Cir. 2014)................................................................. 10, 22, 23

*Wright v. Or. Metallurgical Corp.*,
    360 F.3d 1090 (9th Cir. 2004)........................................................................ 22

**STATUTES**

29 U.S.C. § 1002(3) ........................................................................................... 4

29 U.S.C. § 1002(42) ....................................................................................... 16

29 U.S.C. § 1101(b)(1)................................................................................ 17, 20

29 U.S.C. § 1104 .................................................................................... passim

29 U.S.C. § 1104(a) ......................................................................................... 21

29 U.S.C. § 1104(a)(1)(A) ............................................................................... 24

29 U.S.C. § 1104(a)(1)(A), (B) & (D). ............................................................. 14

29 U.S.C. § 1106 .................................................................................... passim

29 U.S.C. § 1106(a) ......................................................................................... 15

29 U.S.C. § 1106(a)(1) ..................................................................................... 15

29 U.S.C. § 1106(a)(1)(D) ............................................................................... 15

29 U.S.C. § 1106(b) ......................................................................................... 15

29 U.S.C. § 1106(b)(1) ..................................................................................... 15

29 U.S.C. § 1106(b)(2) ..................................................................................... 16

29 U.S.C. § 1106(b)(3) ..................................................................................... 16

U.C.C. § 3-112(a)(i) ........................................................................................ 19

**OTHER AUTHORITIES**

72 Fed. Reg. 64731-01 (Nov. 16, 2007) ........................................................... 6

*Big Banks to America's Firms: We Don't Want Your Cash*, Wall St. J., Oct. 18,
    2015.............................................................................................................. 7

DOL Advisory Opinion 2002-3 ....................................................................... 23

DOL Advisory Opinion 93-24A ...................................................................... 23

**RULES**

Fed. R. Civ. P. 12(b)(6).............................................................................. 12, 13

**REGULATIONS**

17 C.F.R. § 270.22c-1 ...................................................................................... 17

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Two federal Circuit Court decisions already have rejected the very challenge to Fidelity's practices that Plaintiffs bring again in this case. *In re Fidelity ERISA Float Litig.* ("*Kelley II*"), 829 F.3d 55 (1st Cir. 2016) (Souter, J.); *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014). Plaintiffs' counsel filed this case just one month after Justice David Souter's decision affirming dismissal of essentially the same claims brought on behalf of a putative national class that subsumes the one now advanced here. They apparently hope that they can achieve a different outcome in a new court. The Court should reject that maneuver by granting Fidelity's motion to transfer, filed concurrently with this Motion. Alternatively, if this Court declines to transfer, it should dismiss this action with prejudice for the reasons stated below.

The claims that Fidelity violated the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), are no better now than when the First and Eighth Circuits rejected them. The First Amended Complaint ("FAC") alleges that when acting as trustee for 401(k) plans, Fidelity improperly handled what is known in the financial industry as "float"—short-term cash resulting from settling transactions involving investments in and redemptions from mutual funds offered in 401(k) plans—by "diverting" float to short-term investment in interest-bearing accounts and keeping the associated interest. In *Kelley*, Plaintiffs' counsel (among others) filed seven separate class action complaints and amended complaints in the District of Massachusetts challenging the same float process on behalf of the same nationwide class as sought here. Having failed to formulate a viable theory of wrongdoing in *Kelley*, they filed this action. The FAC here tries to obscure some details of the float process by omitting allegations that were pled in the *Kelley* complaints and by making other superficial changes, but Plaintiffs cannot escape the fact that the float process they challenge is fundamentally the same as that at issue in *Tussey* and *Kelley*. Plaintiffs even go so far as to rely on their distorted view of evidence from the trial in *Tussey* and on a declaration submitted—and then abandoned—in *Kelley* (that still bears the *Kelley* district court caption). This Court should not countenance a different result in this case.

Plaintiffs' claims all depend on the flawed premise that the Plans were entitled to the float

FIDELITY'S MOTION TO DISMISS FAC
CASE NO. 5:16-CV-04784-LHK

1    and that Fidelity had a duty to provide the Plans with float interest.  As held by the Eighth Circuit

2    in *Tussey* and First Circuit in *Kelley II*, float—and thus float interest—is simply not an ERISA

3    "plan asset" under the law.  As the Eighth Circuit explained in *Tussey*, depository float (which

4    results from settling investments in mutual funds) is not a plan asset because the Plans own the

5    mutual fund shares the day the participants' cash is contributed, entitling the plan to the full

6    benefits of ownership, including any capital gains or dividends.  746 F.3d at 340.  As a result, the

7    Plans are "no longer also owner of the money used to purchase" the shares.  *Id*.  The conclusion

8    in *Tussey* is reinforced by the Trust Agreements, ordinary notions of property law, and federal

9    securities law.  There is simply no basis in law, much less common sense, that the owner of the

10   mutual fund shares should simultaneously be entitled to own the underlying cash used to purchase

11   those shares.  And as Justice Souter explained in *Kelley II*, redemption float (which results from

12   settling withdrawals of monies from the Plans) is not a plan asset because "[t]he payout from the

13   redemption does not go, and is not intended to go, to the plan itself."  829 F.3d at 60.  Instead, it

14   goes to the participant.  *Id*.  And it is undisputed that "prior to redemption, the cash was an asset

15   of the mutual fund" (not the Plans), and the "[c]ash held by a mutual fund is not transmuted into a

16   plan asset when it is received by an intermediary," like Fidelity, "whose obligation is to transfer it

17   directly to a participant."  *Id*. at 60-62.

18          Consistent with *Tussey* and *Kelley II*, the Court should reject Plaintiffs' conclusory legal

19   assertion that float is a "plan asset."  Plaintiffs' conclusory assertion that Fidelity retained the

20   "benefits" of the float does not save their claims because the Plans had no right to the float or

21   float interest.  Plaintiffs allege no facts to establish that Fidelity kept or misused any Plan monies

22   or that its float processes unfairly impacted Plan participants.  As Justice Souter recognized in

23   *Kelley II*, the participants "do not allege that they are or will be short so much as a penny of any

24   benefit to which they are entitled."  829 F.3d at 57.  No basis exists to waste the time and

25   resources of the Court and the parties by re-litigating these failed claims.

26          Plaintiffs' references to additional ERISA subsections under 29 U.S.C. §§ 1104 and 1106

27   in their latest complaint—alleging that Fidelity failed to disclose a diversion of plan assets,

28   engaged in self-dealing transactions, and violated the Trust Agreements—cannot achieve a

different result.  The core factual challenge underlying those claims remains the same, as does the claims' fatal flaw.  There can be no diversion of plan assets and no improper plan transactions where, as here, float and float interest are not assets of the Plans as a matter of law.  The Department of Labor guidance Plaintiffs cite does not avoid this problem, and its application was not accepted in *Tussey*.  Likewise, ERISA's prohibitions on self-dealing relate to "assets of the plan" and transactions involving the Plan, which float and float interest are not.  Moreover, no violation of the Trust Agreements exists where float and float interest are not monies that belong to the Plans or to which the Plans have any rights.

Plaintiffs' claims are also subject to dismissal on the alternative ground that Fidelity is not an ERISA fiduciary as to float, as Judge Denise Casper held in dismissing the *Kelley* complaint. *In re Fidelity Float Litig.*, 2015 WL 1061497, at *9 (D. Mass. Mar. 11, 2015) ("*Kelley I*").  Once Fidelity provides immediate and unfettered access to the promised benefits in accord with the Trust Agreements, it has fulfilled its job as fiduciary; its handling of float is not a fiduciary function.  Plaintiffs allege no facts establishing a breach of the Trust Agreements, as the only provision they focus on does not pertain to float or float interest.  Plaintiffs make no allegation that Fidelity failed to process participants' deposits or withdrawals consistent with the Trust Agreements or that it otherwise diminished or impaired their rights.  Plaintiffs thus have not alleged any fiduciary breach.

Artful pleading cannot avoid that *Kelley* and *Tussey* squarely dispose of Plaintiffs' recycled claims.  As a matter of law, Fidelity's float process did not violate any fiduciary obligation under ERISA.  Fidelity has filed a motion to transfer this case to the District of Massachusetts based largely on Plaintiffs' obvious forum shopping and believes this Motion should be decided by that court.  But if this Court retains the case, it should dismiss the FAC with prejudice.

## II.    FACTUAL BACKGROUND

Many of the allegations in the FAC are both inaccurate and contrary to the facts alleged in the earlier float complaints, including those made by the same Plaintiffs' counsel as here. Nonetheless, for purposes of this Motion only, Fidelity does not challenge the accuracy of the

FAC's factual allegations—although Fidelity does challenge the FAC's conclusory assertions and arguments.  If this case survives Rule 12(b)(6), Fidelity will show that, as Plaintiffs' counsel should be well aware, the FAC contains many factual errors and inconsistencies.

### A.    401(k) Plans and Fidelity's "Float" Process

ERISA regulates "employee benefit plans," including the 401(k) plans at issue here.  29 U.S.C. § 1002(3).  A 401(k) plan is a defined contribution plan offered as a benefit by many employers (often called plan "sponsors") to help their employees save for retirement.  FAC ¶ 4. Defendants United Airlines and HP are plan sponsors.  *Id.* ¶¶ 3, 22-23.  The plan participants, like Plaintiffs, are employees who elect to participate in a 401(k) plan and contribute a portion of their pre-tax compensation for investment in one or more investment options—typically mutual funds—designated by their plan sponsor.  *Id.* ¶¶ 3-4, 8, 20-21.

To facilitate the participants' investments in the plans, the plan sponsor often engages a third-party service provider (such as Fidelity) to serve as the plan's directed trustee and/or recordkeeper.  *Id.* ¶¶ 15, 33.  The scope of Fidelity's contractual relationship with the plan sponsor is often documented in a "Trust Agreement" or in a "Service Agreement," depending on the particular services Fidelity is providing.  *Id.* ¶¶ 6, 34.  Fidelity's obligations include (i) facilitating the purchase of mutual fund shares at the direction of the plan participants through their elected contributions and (ii) acting as intermediary to facilitate the transfer of payments from mutual funds to participants who choose to withdraw funds from their plan and "cash out"— *i.e.*, redeem their mutual fund shares in exchange for cash equal to the market value of those shares.  *Id.* ¶ 35.[1]

For logistical and other reasons not relevant here and that Plaintiffs do not fault, there is a short period—typically overnight—between the date participants' cash contributions are made and their accounts are credited with the mutual fund shares they purchase (the "trade date"), and the date that the cash exchanged for mutual fund shares is actually transferred to a portfolio account for the mutual fund (the "settlement date").  *Tussey*, 746 F.3d at 332; *Burgess* Compl., Dkt. 1, ¶ 20; *cf.* FAC ¶ 16.  Similarly, when participants decide to withdraw money from the plan,

---

[1] Fidelity served as trustee of the HP Plan only until January 2, 2013.  FAC ¶¶ 5, 33.

1   there is a short period—typically a few days—between the time the cash value of participants'

2   withdrawals is sent via check or electronic funds transfer ("EFT") and the time the EFT reaches

3   their bank account or their check is deposited.  This cash held temporarily in short-term

4   suspension—pending settlement of completed investments or clearance of checks or EFTs—is

5   known as "float." *Tussey*, 746 F.3d at 332; FAC ¶¶ 1, 16, 18, 55, 58, 62-63, 66.  Specifically, the

6   cash contributed by the participant but held by Fidelity pending settlement of completed

7   investments in the mutual funds is known as "depository float," while the cash withdrawn by the

8   participant but held awaiting completion of the distribution is known as "redemption float."  Float

9   is deposited overnight in interest-bearing, collateralized investments, and the associated interest is

10   known as "float interest" or "float income." *Id.* ¶ 1.[2]

11       Fidelity's float process was the subject of the First and Eighth Circuit actions and is

12   now—for the third time—challenged again here. *Tussey*, 746 F.3d at 332, 339-40; *Kelley II*, 829

13   F.3d at 59; FAC ¶¶ 1-2, 14, 16, 18, 40, 58, 62-63, 66.  As Judge Casper noted in *Kelley I*, there

14   was "little debate among the parties" about Fidelity's mechanics for handling float, 2015 WL

15   1061497, at *3.  The mechanics are as follows:

16       **Depository Float:** When a participant makes cash contributions to her plan, those

17   contributions must be directed to an investment option within the plan's investment lineup.  Most

18   often these investment options are mutual funds.  Fidelity processed those contributions and

19   "credited the participant's account with shares in [the participant's elected] investment option

20   based on the closing share price on the date of contribution." *Tussey*, 746 F.3d at 332.  The plan,

21   on behalf of the participant, "became the owner of the selected investment option as of the date

22   the contribution was made … entitling the Plan to any dividends or any other change in the fund

23   that day." *Id.*  Because contributions used to purchase mutual fund shares cannot be transferred

24   to a mutual fund portfolio account until the next day, *id.*, Fidelity temporarily transferred the cash

25   earmarked for the investment option to a separate interest-bearing omnibus account owned and

26   held by Fidelity, FAC ¶¶ 1-2, 16, for the benefit of the investment options. *Tussey*, 746 F.3d at

27

---

28   [2] The terms "float interest" and "float income" are used interchangeably to refer to the interest
accumulated on the short-term investment of float.

FIDELITY'S MOTION TO DISMISS FAC
CASE NO. 5:16-CV-04784-LHK

332.  Interest on this float was used by Fidelity to defray bank fees and other expenses on those overnight accounts before, depending on the time period, allocating any remaining float interest on a pro rata basis back to each investment option choosing to receive it.  *Id.*; *cf. Kelley II*, 829 F.3d at 59 (same for redemption float).

**Redemption Float:** Fidelity used a similar process for performing its "intermediary functions" to effectuate a participant's withdrawal from an investment option.  When a participant requested a withdrawal from the plan, her mutual fund shares were "redeemed" by the mutual fund paying money from the fund's own account "equal to the market value of the shares" to an account owned by and registered to Fidelity.  *Kelley II*, 829 F.3d at 58; *Tussey*, 746 F.3d at 332 n.4 (withdrawn funds "transferred to a redemption account held for the benefit of the investment options and treated in a similar manner to depository float"); FAC ¶¶ 1-2, 16.  Under the Trust Agreements, participants are paid by check or EFT, at the participant's election.  *Id.* ¶ 11.  For participants who elect to redeem cash via electronic transfer, after the transaction clears, the cash is transferred directly to the participant's bank account in accordance with the participant's transfer instructions.  *Kelley II*, 829 F.3d at 58.  For those who request a check instead, the cash is transferred to a separate interest-bearing checking account—the "disbursement account"—which is registered to Fidelity, and a check is written on that account to the participant.  *Id.*  Like any ordinary checking account, the participant does not receive interest that accumulated on cash held in the disbursement account while the check remains uncashed.

Fidelity's role as intermediary for these transactions "is well established under the trust agreements."  *Id.*  As Plaintiffs acknowledged, Fidelity used its "omnibus cash management account … to efficiently net offsetting transactions and reduce transaction costs, and to ensure proper accounting of all plan transactions."  Compl., Dkt. 1, ¶ 30; *cf.* FAC ¶¶ 2, 12, 13, 16, 40; 72 Fed. Reg. 64731-01 (Nov. 16, 2007) ("Certain commenters described omnibus accounting as 'best practice' in the industry.").  Because these omnibus accounts are owned and "controlled" by Fidelity, FAC ¶¶ 2, 16, it is Fidelity and the mutual funds—not the plans—that bear all risk of loss on the accounts and that are responsible for all account fees.  In the current low interest rate environment, it is common for bank fees on these accounts to far exceed float interest.  *Big Banks*

1   *to America's Firms: We Don't Want Your Cash*, Wall St. J., Oct. 18, 2015.

2         **How Fidelity Used Float Interest:** Plaintiffs assert the legal conclusion that Fidelity

3   retained the benefit of the float interest.  *E.g.*, FAC ¶ 1.  Plaintiffs do not, however, include any

4   factual allegations to support that conclusion, and Plaintiffs are vague even as to what their

5   assertion really means.  For example, they do not allege that Fidelity retained any net float

6   interest as compensation or income for itself after defraying fees on the float accounts.  To the

7   contrary, the First and Eighth Circuits stated that Fidelity did ***not*** retain any float interest earned

8   on overnight investments in Fidelity's omnibus bank accounts before late 2011.  *Tussey*, 746 F.3d

9   at 332; *Kelley II*, 829 F.3d at 59.  Rather, the float interest was used first to pay bank fees on these

10  interest-bearing accounts.  *Id.*  Any net float interest remaining after payment of fees was

11  distributed pro rata back to the mutual funds whose cash transfers were being facilitated through

12  the accounts and that elected to receive such distributions.  *Id.*

13         In addition, although Plaintiffs do not appear to address the distinction, Fidelity

14  coordinated with plan sponsors to amend the applicable agreements with the Plans or take other

15  measures to acknowledge modifications to the handling of float and float interest in and around

16  late 2011.  As of that period, float interest is used to defray fees on the float accounts and then,

17  depending on the agreement, Fidelity will either provide the Plans with any remaining amount or

18  retain it as mutually agreed-to compensation, as discussed below.

19         **B.**      **The History of the Float Claims and the First and Eighth Circuit Decisions**

20         Fidelity's float processes were challenged in a 2006 class action by participants in ABB,

21  Inc.'s 401(k) plans.  *See Tussey*, 746 F.3d at 332-33.  Since then, *Tussey* went to trial, and four

22  separate putative nationwide class actions seeking relief for participants in all Fidelity-served

23  plans were consolidated in *Kelley*, which was litigated in federal district court in Massachusetts.

24  Two federal appellate court decisions—one from the Eighth Circuit in 2014 and another authored

25  by Justice Souter sitting by designation on the First Circuit in July 2016—rejected the notion that

26  Fidelity's float processes violated ERISA or were otherwise unlawful.

27                  1.      **The *Tussey* Trial and Eighth Circuit Decision**

28         In *Tussey*, ABB plan participants alleged that ABB, as plan sponsor, and Fidelity, as

FIDELITY'S MOTION TO DISMISS FAC
CASE NO. 5:16-CV-04784-LHK

1    recordkeeper and directed trustee, had breached fiduciary duties under ERISA by, among other

2    things, "failing to capture additional compensation streams for the benefit of the Plan." *Tussey v.*

3    *ABB, Inc.*, 2007 WL 4289694, at *2 (W.D. Mo. Dec. 3, 2007) (certifying class). These claims, by

4    then referred to as "float" claims, were presented to the court during a four-week bench trial in

5    2010. *See Tussey*, 746 F.3d at 332-33. The district court ruled against Fidelity on the depository

6    and redemption float claims and entered judgment for the plaintiffs on March 31, 2012. *Tussey v.*

7    *ABB, Inc.*, 2012 WL 1113291, at *1, 32-34 (W.D. Mo. Mar. 31, 2012).

8            Fidelity appealed and, on March 19, 2014, the Eighth Circuit reversed the judgment

9    against Fidelity, holding that Fidelity's depository and redemption float processes did ***not*** violate

10   ERISA. *Tussey*, 746 F.3d at 339-40. As discussed in the *Tussey* dissent, the Eighth Circuit

11   majority rejected as unpersuasive old Department of Labor ("DOL") guidance discussing float

12   (cited again in the FAC here). *Id.* at 341-42. The majority held that "[b]ecause the participants

13   have failed to show the float was a Plan asset … the district court erred in finding Fidelity

14   breached its fiduciary duty of loyalty by paying the expenses on the float accounts and

15   distributing the remaining float to the investment options." *Id.* at 340. Specifically, on depository

16   float, the court held that "[o]nce the Plan became the owner of the [mutual fund] shares," and was

17   entitled to "any capital gains or dividends," the Plan was "no longer also owner of the money

18   used to purchase them, which flowed to the investment options." *Id.* Thus, "Fidelity did not

19   breach any fiduciary duties with respect to the depository account." *Id.* On redemption float, the

20   court held that the redemption account generating the float "was registered for the benefit of the

21   investment options," and that "[a]s a matter of black-letter commercial law, the payee of an

22   uncashed check has no title in or right to interest on the account funds." *Id.* Because "the

23   participants d[id] not cite any record evidence establishing the Plan as 'the funder of the check' or

24   the owner of the funds in the redemption account … the Plan had no right to float income from

25   that account." *Id.*

26           2.      **The *Kelley* Litigation and Justice Souter's First Circuit Opinion**

27           On February 5, 2013—after the trial court decision in *Tussey* but before the Eighth

28   Circuit's reversal—the same counsel that represent Plaintiffs here filed the *Kelley* complaint in

FIDELITY'S MOTION TO DISMISS FAC
CASE NO. 5:16-CV-04784-LHK

the District of Massachusetts.  That complaint was a copycat based almost entirely on *Tussey*, even expressly incorporating the *Tussey* court's findings of fact and conclusions of law and asserting that Fidelity should be "foreclosed … from re-litigating liability and damages issues that were decided against it in *Tussey*."  *Kelley* Compl. ¶¶ 6, 11.  The *Kelley* complaint asserted claims against Fidelity for the same conduct challenged in *Tussey*, but on behalf of a nationwide class of all Fidelity-served plans—rather than just the two ABB plans in *Tussey*—alleging Fidelity breached its fiduciary duties and engaged in "prohibited transactions" under 29 U.S.C. §§ 1104 and 1106 regarding its float process.  *Id.* ¶¶ 2, 4-5, 26, 58-73.  The putative national class in *Kelley* was a super-set of the putative class here.  *Burgess* FAC ¶ 86.

Because the *Kelley* action was initiated to seize on the *Tussey* district court's findings of fact and conclusions of law, going so far as to expressly incorporate those findings and conclusions, the plaintiffs were left scrambling to salvage their claims when the Eighth Circuit reversed the district court's judgment.  In response to the Eight Circuit's reversal, the plaintiffs in *Kelley* filed a series of amended complaints, asserting the same claims under 29 U.S.C. §§ 1104 and 1106 but removing (or generalizing) factual allegations critical to the Eighth Circuit's analysis and ultimately narrowing their allegations to pursue claims only as to Fidelity's redemption float process (*i.e.*, dropping their depository float theory).  *Kelley* Second Am. Compl., Dkt. 122.  They also included the same declaration from Duane Napier (a former Fidelity employee from the mid-1990s) that are included as Exhibit A to the FAC here in support of a similar theory addressing float that resulted from Plans' conversion to, and away from, Fidelity's investment platform.  But, as with their depository float claims, they ultimately abandoned the claims based on Mr. Napier's declaration from the final operative complaint in *Kelley*.  In that complaint, the plaintiffs alleged Fidelity violated ERISA by (1) using float interest to defray bank fees on accounts that Fidelity was supposedly obligated to pay, and (2) allowing any remainder net float interest to be remitted to the mutual funds in which the plan participants invested rather than to the plans.  *Id.* ¶¶ 32, 34, 36-38, 59-60, 65-69.

Fidelity moved to dismiss that complaint on two primary grounds.  ***First***, it argued based on *Tussey* and analogous precedent that redemption float was not a "plan asset" and thus

Fidelity's float processes did not violate ERISA duties because the claims depended on float being a plan asset. **Second**, it argued it was not a fiduciary as to the float and thus did not breach any fiduciary obligations in handling float.

The **Massachusetts District Court Dismissal:** The district court agreed with Fidelity on both arguments. First, with respect to whether float is a "plan asset," the court examined *Tussey*, along with two analogous cases involving distributions of life insurance benefits under ERISA plans—*Merrimon v. Unum Life Ins. Co. of Am.*, 758 F.3d 46 (1st Cir. 2014), and *Vander Luitgaren v. Sun Life Assurance  Co. of Can.*, 765 F.3d 59 (1st Cir. 2014).  The court noted that "the Plan does not own the underlying assets before they are withdrawn [from the mutual fund]," and held that "the assets are not transmogrified into plan assets when they are credited to the beneficiary's account." *Kelley I*, 2015 WL 1061497, at *5.  The court also rejected the plaintiffs' reliance on "guidance from the [Department of Labor]" to argue that "a fiduciary's undisclosed use of float income is a prohibited transaction under ERISA." *Id.* at *7.  Not only did the DOL guidance pre-date *Tussey*, *Merrimon*, and *Vander Luitgaren* by over a decade, it also "assumes that plan assets have been transferred into the trust accounts and that plan assets are the source of the float income." *Id.*  Although plaintiffs alleged—as they do again in the FAC—that "Fidelity held [the withdrawn funds] … in trust for the benefit of the Plans," they "allege[d] no particularized facts to support the conclusion that those funds retained their status as Plan assets." *Id.*  Indeed, "Plaintiffs' argument appear[ed] to ignore that the assets at issue were in fact **withdrawn** from the Plan." *Id.* at *8 (emphasis added).  The court recognized that the Plans did not own the float accounts, and thus were neither accountable for bank fees or risk of loss, nor entitled to any float interest. *Id.*  The court also held that "even if float were a plan asset," Fidelity was "not an ERISA fiduciary as to float," warranting dismissal of the plaintiffs' claims. *Id.* at *9-10.  "Since the governing documents do not provide for such an obligation … and since the Plaintiffs have not alleged that Fidelity did not process withdrawals, mail distribution checks or remit distributions … Plaintiffs have not sufficiently alleged a fiduciary breach." *Id.*

The **First Circuit Opinion:** Justice Souter's opinion affirmed the dismissal of the claims against Fidelity.  The First Circuit thus became the third court to hold that redemption float is not

- 10 -

a "plan asset" and that Fidelity's conduct did not violate ERISA.  The court noted as a threshold matter that the participants "claim no direct stake in the plan assets that they say are being improperly used and no consequential loss personal to them.  They do not allege that they are or will be short so much as a penny of any benefit to which they are entitled. … [W]hatever mischief the participants see in [Fidelity's] actions, the concern is apparently shared only halfheartedly by the plans themselves.  That is likely because the behavior complained of is nothing other than what the plans expected." *Kelley II*, 829 F.3d at 57.

    The court further explained that "[t]he payout from the redemption does not go, and is not intended to go, to the plan itself.  … Plaintiffs allege no facts to support the proposition that [withdrawn] cash becomes a plan asset simply because it moves, not directly from the fund to the participant, but from the fund through Fidelity on its way to the participant." *Id.* at 60.  Fidelity is "straightforwardly viewed as an agent charged with transferring the cash from the fund to the participant outside the plan, not to the plan itself." *Id.*  Nothing in the Plan documents or basic notions of property rights supports the conclusion that the Plans had any "rights in the traveling cash," particularly because the Plans did not "bear[] the risk if the cash is lost" and because the Plan documents "prevent plan trusts from holding any uninvested cash." *Id.* at 60-61.  At base, "[c]ash held by a mutual fund is not transmuted into a plan asset when it is received by an intermediary whose obligation is to transfer it directly to the participant." *Id.* at 62.

### C.    The Operative Complaint

    Plaintiffs filed their original complaint on August 18, 2016 and their FAC on September 22, 2016.  Dkts. 1, 16.  In the FAC, Plaintiffs—participants in the United and HP 401(k) Plans—purport to bring claims on behalf of themselves and a nationwide class of 401(k) Plans alleging Fidelity "breached" fiduciary duties and engaged in "prohibited transactions" under ERISA 29 U.S.C. §§ 1104 and 1106 based on the same business practices at issue in *Tussey* and *Kelley*.  The FAC explicitly draws on purported, but inaccurately described, testimony from the trial in *Tussey* and on a declaration submitted (and then withdrawn) in *Kelley* that still bears the *Kelley* district court caption.  FAC ¶¶ 70-71 & Ex. A.  Although Plaintiffs add a few "new" theories of liability under §§ 1104 and 1106, and are vague about some aspects of Fidelity's practices, they

1   fundamentally challenge the same float processes.  *Id.* ¶¶ 1, 2, 16, 18, 55, 58, 88b.  Even the

2   national class that they seek to certify against Fidelity is named the "Float Plans Class."  *Id.* ¶ 86.

3       The gravamen of the FAC is that Fidelity allegedly "diverted for its own use cash assets

4   [it] received as trustee …, reinvested or otherwise used that money for its own benefit, and kept

5   the investment proceeds—called the 'float income.'"  *Id.* ¶ 1; *see also id.* ¶ 2 ("Fidelity diverted

6   the cash from the trusts, deposited the cash into accounts that it controlled, and used the cash for

7   its own benefit."), ¶ 16.  As in *Tussey* and *Kelley*, Plaintiffs make the conclusory assertions that

8   float and float income are "plan assets" and "belong[] to the plan."  FAC ¶ 14; *see also id.* ¶ 36

9   (asserting unsupported conclusion that Fidelity holds funds in transit "on behalf of the HP Plan"

10  and is not an "intermediary").  But they plead no facts that would establish that the Plans—one of

11  which (HP) was also at issue in *Kelley*—had any right to the float or float interest upon either

12  contribution or redemption.

13      The FAC also includes a claim for "non-disclosure" and "concealment" under 29 U.S.C.

14  § 1104 that was not asserted in *Tussey* or *Kelley*.  FAC ¶¶ 54-55, 61-73 & Claim III.  This claim,

15  however, is still based on the same underlying float process and is premised on alleged wrongful

16  management of the Plans and their assets.  *Id.* ¶¶ 72, 113-115.  In support of this claim, Plaintiffs

17  also point to much of the same DOL guidance issued over a decade ago that was raised in *Tussey*

18  and discussed in the district court's decision in *Kelley I.  Id.* ¶¶ 54-55, 63; *Tussey*, 746 F.3d at

19  341-42 (Bye, J., dissenting); *Kelley I*, 2015 WL 1061497, at *7 (distinguishing DOL guidance

20  and noting it is "approximately twenty-one and twelve years old, respectively, [] pre-dates the

21  First Circuit decisions" in *Merrimon* and *Vander Luitgaren*, "and pre-dates the Eighth Circuit

22  decision in *Tussey* … which addresse[d] the float practices challenged here").

23  **III.   LEGAL STANDARD**

24      Under Rule 12(b)(6), a court should dismiss a complaint that does not set forth sufficient

25  facts to "state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.

26  544, 570 (2007).  The court need not accept conclusory allegations, unreasonable inferences, or

27  legal conclusions set out in the form of factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 681

28  (2009); *Twombly*, 550 U.S. at 555 ("plaintiff's obligation to provide the 'grounds' of his

FIDELITY'S MOTION TO DISMISS FAC
CASE NO. 5:16-CV-04784-LHK

'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do") (citation omitted).  Thus, a plaintiff must plead factual allegations sufficient "to raise the right to relief above the speculative level."  *Id.* at 555.  When resolving "a Rule 12(b)(6) motion to dismiss," the Court "must consider the complaint in its entirety, as well as … documents incorporated … by reference, and matters of which a court may take judicial notice."  *E.g.*, *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 322 (2007); *In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1023 (N.D. Cal. 2014) (Koh, J.).

## IV.    ARGUMENT

As in *Tussey* and *Kelley*, Plaintiffs' claims all rise and fall on the premise that Fidelity's handling of float and float interest involved plan assets or transactions with the Plans.  But, as before, Plaintiffs cannot establish that Fidelity used plan assets or engaged in transactions with the Plans related to its float processes.  The Supreme Court has stated that Rule 12(b)(6) is an "important mechanism for weeding out meritless claims" in ERISA cases.  *Fifth Third Bancorp. v. Dudenhoeffer*, 134 S. Ct. 2459, 2471 (2014).  This is a prime example of where Rule 12(b)(6) is appropriate, particularly in light of the extensive history of the float actions and the two U.S. Courts of Appeals decisions already to have squarely rejected the claims asserted here.  No amount of pleading or new legal theories can overcome the fact that float and float interest are simply not plan assets or otherwise property of the Plans, as is required to establish an ERISA violation.  The claims in the FAC thus remain "as lacking as the proffers in *Tussey*" and *Kelley*, and they should be dismissed.  *Kelley II*, 829 F.3d at 64.

### A.    Float and Float Interest Still Are Not "Plan Assets" Subject to ERISA As a Matter of Law

#### 1.    All Claims Depend on Plans' Entitlement to Float and Float Interest

The crux of Plaintiffs' FAC is simple: that during the contribution and redemption process, Fidelity allegedly "diverted cash assets"—the float—that allegedly belonged to the Plans.  *E.g.*, FAC ¶¶ 1-2, 13-15, 16 ("Fidelity has failed to satisfy its strict fiduciary responsibilities with respect to the HP and [United] *Plans' cash*."), ¶ 40.  Based on the fundamentally flawed premise that float and float interest belonged to the Plans, Plaintiffs assert

1    myriad theories to claim that Fidelity breached its fiduciary duties and engaged in prohibited

2    transactions in violation of ERISA, 29 U.S.C. §§ 1104 and 1106.  Several of those theories are

3    recycled without change from *Kelley*, and others purport to rely on different provisions within the

4    same ERISA framework under §§ 1104 and 1106.  But all turn on the threshold premise that the

5    Plans were supposedly entitled to the float and float interest.  And Plaintiffs do not—and

6    cannot—allege any facts establishing such an entitlement.

7                              a.      **Fiduciary Breach Claim Under ERISA 29 U.S.C. § 1104**

8            As in the prior float actions, Plaintiffs allege that Fidelity's float process breached its

9    fiduciary duties under 29 U.S.C. § 1104.  Specifically, they allege Fidelity violated its duties of

10   loyalty, prudence, and obedience under § 1104(a)(1)(A), (B), and (D).  FAC ¶¶ 47-49 & Claim I.

11   But the First and Eighth Circuits both held that Fidelity did not breach any fiduciary duties to the

12   Plans regarding its float process; float was not a plan asset and the Plans had no entitlement to it.

13   Recycling this claim again here does not somehow transform float into something that belongs to

14   the Plans or create a claim for breach of fiduciary duties where none existed before.

15           That Plaintiffs now also allege Fidelity breached its fiduciary duties by violating the

16   contractual terms of the Trust Agreements does not save their claim.  This theory depends on the

17   Trust Agreements requiring that float and float interest be plan assets or otherwise the property of

18   the Plans.  But the Trust Agreements require no such thing.  They do no more than restate the

19   ERISA requirement that plan assets be used for the benefit of the Plan.  FAC ¶ 49.  This is

20   confirmed by both the HP Trust Agreement quoted in the FAC and the judicially noticeable

21   United Trust Agreement.  The United Agreement, for example, states that "no part of the Trust

22   allocable to a Plan may be used for, or diverted to, purposes other than the exclusive benefit of

23   the Participants in the Plan … ."  *See* Fidelity's Request for Judicial Notice ("RJN"), Ex. A, § 3.

24   Likewise, as Plaintiffs acknowledge, the HP Agreement states that "no part of the Trust may be

25   used for, or diverted to, purposes other than the exclusive benefit of the Participants").  FAC

26   ¶¶ 42, 49.  If the float is not a plan asset or otherwise property of the Plans (*i.e.*, part of the trust

27   allocable to the Plan), then as a matter of law Fidelity did not violate the terms of the Trust

28   Agreements by "divert[ing] part of the trust—namely, the [float]," as the FAC asserts.  *Id.* ¶ 49.

FIDELITY'S MOTION TO DISMISS FAC
CASE NO. 5:16-CV-04784-LHK

1   The breach-of-contract theory, like Plaintiffs' other theories, therefore turns on whether the float

2   was a plan asset or otherwise belonged to the Plans, an issue already decided by two U.S. Courts

3   of Appeals.

4         **b.**  **Prohibited Transaction Claim Under ERISA 29 U.S.C. § 1106**

5      Plaintiffs' "prohibited transaction" theories under 29 U.S.C. § 1106 likewise all turn on

6   the failed threshold premise that float and float interest are plan assets or otherwise belong to the

7   Plans, and therefore Fidelity's handling of float constitutes a transaction involving the Plans.  As

8   with the fiduciary duty claim, Plaintiffs re-assert several theories of "prohibited transactions" that

9   were rejected in *Kelley*.  For example, Plaintiffs assert that Fidelity's diversion of cash amounted

10  again to a "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan,"

11  *id.* § 1106(a)(1)(D), and "deal[ing] with the assets of the plan in its own interest or for [its] own

12  account," *id.* § 1106(b)(1).  FAC ¶¶ 51, 53 & Claim 2; *Kelley* Second Am. Compl. ¶¶ 65, 69

13  ("ERISA § [1106(b)(1)] prohibits a fiduciary from dealing with the assets of a plan for its own

14  interest or account.").  These provisions, by their terms, require the misuse of "assets of the plan"

15  and are squarely within the scope of the theories rejected in *Kelley II*.

16     Plaintiffs now also round out the laundry list of other "prohibited transactions" under

17  § 1106(a) by claiming that Fidelity's float processes further constitute a (1) "sale or exchange, or

18  leasing, of any property between the plan and a party in interest," (2) "lending of money or other

19  extension of credit between the plan and a party in interest," and/or (3) "furnishing of goods,

20  services, or facilities between the plan and a party in interest."  FAC ¶ 51.  But Plaintiffs fail to

21  allege facts to show that these theories as applied could be any different from those previously

22  alleged in *Kelley*.  Moreover, these alleged transactions on their face require at a minimum a

23  transaction involving the Plan and that a fiduciary "cause[d] the plan to engage in a transaction"

24  that was improper.  29 U.S.C. § 1106(a)(1).  For this reason, these theories—like the others—

25  require that Plaintiffs satisfy the threshold premise that the float Fidelity allegedly "diverted" was

26  a plan asset or otherwise was something the Plans had the right to control.

27     Plaintiffs' citation to additional provisions under § 1106(b) likewise does not change the

28  analysis.  Plaintiffs allege Fidelity's float process constitutes "act[ing] in any transaction

FIDELITY'S MOTION TO DISMISS FAC
CASE NO. 5:16-CV-04784-LHK

1   ***involving the plan*** on behalf of a party ... whose interests are adverse to the interests of the plan

2   or [its participants]" and "receiv[ing] ... consideration for [Fidelity's] own personal account from

3   any party dealing with such plan in connection with a transaction involving ***assets of the plan***."

4   FAC ¶ 53 (citing 29 U.S.C. § 1106(b)(2) and (3)) (emphasis added).  But, again, these theories

5   require that the Plans be "involved" in the transactions or that "assets of the plan" be misused.

6          2.    **"Plan Asset" Is Determined by Ordinary Notions of Property Rights**

7          Plaintiffs correctly allege that the prerequisite issue of whether float is a "plan asset" or

8   otherwise the property of the Plans is determined "under ordinary notions of property rights."

9   FAC ¶ 14.  The First and Eighth Circuits in *Tussey* and *Kelley II* applied ordinary notions of

10  property rights to determine whether float was a plan asset, and the DOL does the same.  *Tussey*,

11  746 F.3d at 339 ("Fidelity's appeal to basic property rights is persuasive" and "[t]he Secretary of

12  Labor has repeatedly defined 'plan assets' consistently with ordinary notions of property rights");

13  *Kelley II*, 829 F.3d at 60; *cf. Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 105 (2d Cir. 2011)

14  ("DOL … has repeatedly advised that plan assets should be identified based on 'ordinary notions

15  of property rights.'");  29 U.S.C. § 1002(42) ("plan assets" defined by such regulations as DOL

16  may prescribe).  Ninth Circuit authority confirms the same result, looking at whether functionally

17  "the item in question may be used for the benefit (financial or otherwise) of the fiduciary at the

18  expense of plan participants or beneficiaries."  *Acosta v. Pac. Enters.*, 950 F.2d 611, 620 (9th Cir.

19  1991) (employing phrasing to recognize plan assets need not be financial asset).  An item cannot

20  be used "at the expense of plan participants or beneficiaries," of course, if the item is one in

21  which they have no property interest.  And as Justice Souter explained, Plaintiffs do not allege

22  that Fidelity's float process caused Plan participants or beneficiaries to be "short so much as a

23  penny of any benefit to which they are entitled under … their plans."  *Kelley II*, 829 F.3d at 57.

24         3.    **The Plans Have No Right to Depository Float**

25         By any measure, depository float and float interest are simply not plan assets or property

26  to which the Plans are entitled.  *Tussey*, 746 F.3d at 332, 339-40.  Because Plaintiffs' claims are

27  premised on the Plans' entitlement to the "diverted" depository float (and float interest) received

28  from participants for investment, *see* FAC ¶¶ 2, 14, 16, 88b, Plaintiffs' claims therefore fail as a

matter of law.  As the Eighth Circuit held, when a participant makes a contribution, the Plan "became the owner of the shares of the selected investment option … the same day the contribution [is] received," and "[o]nce the plan became the owner of the shares, it [is] no longer also owner of the money used to purchase them, which flow[s] to the investment options." *Tussey*, 746 F.3d at 339-40.  The Plans (as nominal owner for the participants) "receive[] the full benefit of ownership" of the investment option shares, including "any capital gains and dividends from the purchased shares" as of 4 p.m. EST on the purchase date—*i.e.*, when the transaction closes at the end of the trading day and the share price is set.  *Id.*  In these circumstances, as between the Plans and the mutual funds, only the mutual funds have a claim of "property rights in the depository float."  *Id.*; 29 U.S.C. § 1101(b)(1) (for investments in mutual fund securities, "the assets of such plan shall be deemed to include such security but shall not, solely by reason of such investment, be deemed to include any assets of such [mutual fund]"); *cf. Kelley II*, 829 F.3d at 60 ("It is undisputed that, prior to the redemption, the cash was an asset of the mutual fund.").

Plaintiffs allege no facts in the FAC to undermine *Tussey*'s conclusion about depository float, nor could they.  The process is well-established under the Trust Agreements and federal securities law.  Fidelity must purchase the mutual fund shares "on the date on which the Trustee receives" the cash from the participant and all information necessary to effect the transaction. *E.g.*, RJN, Ex. A § 5(d)(i); *see also Tussey*, 746 F.3d at 332.  And the Investment Company Act of 1940, which prohibits an investor from placing a purchase at the 4 p.m. price and canceling that purchase after 4 p.m., confirms that the Plan must be treated as irrevocable owner of the shares as of 4 p.m. on the purchase date.  *See* 17 C.F.R. § 270.22c-1.  This prohibition on what is known as "late trading" is a core principle of mutual fund law, and it is a strict rule that Plaintiffs cannot simply plead around.  *E.g.*, *SEC v. Pentagon Capital Mgmt.*, 844 F. Supp. 2d 377, 418-19 (S.D.N.Y. 2012), *aff'd in relevant part*, 725 F.3d 279 (2d Cir. 2013) ("the line with regard to late trading is and was startlingly bright").  In other words, as of the close of trading at 4 p.m. each day, a purchaser cannot claw back a purchase, but instead owns the market value of the shares and receives the full benefits and risks of ownership until those shares are redeemed or sold.  *See Tussey*, 746 F.3d at 339-40.

As the owner of the mutual fund shares on the date the contribution was made, the Plans cannot simultaneously own or otherwise be entitled to the cash used to purchase those shares.  *Id.* at 340; *see also Assocs. in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561, 569 (7th Cir. 1991) (where plan's administrator "began crediting [the plan] with interest from the day that the funds were received" even though annuities were not actually purchased until up to a week later, the plan had no claim to "the value of the float" subsequently earned on that money). There is no reason—much less one grounded in ordinary notions of property law—that the Plans are entitled to own both the item purchased (the shares) as well as the money used to purchase it (the contribution).  *Tussey*, 746 F.3d at 340.

Although Plaintiffs assert the naked conclusion that Fidelity held the float accounts "in the name of" or "for the benefit of" the plans (FAC ¶ 36), and that the cash Fidelity diverted was a "plan asset" (*id.* ¶ 14), these legal conclusions are unsupported by any facts about Fidelity's handling and investment of contributions to state a plausible claim that the traveling cash—once contributed for investment—remained an asset of the Plan or the participant.  Plaintiffs do not, for example, allege that the interest-bearing float accounts were registered to the Plans or that the Plans expected the cash in those accounts to be held for or provided to them.  Indeed, such an allegation would be contrary to the Eighth Circuit's holding in *Tussey*.  746 F.3d at 332, 339-40 (contributions "flowed into a depository account held at Deutsche Bank for the benefit of the Plan investment options").  Plaintiffs admit, as they must, that the float accounts were owned and controlled by Fidelity—not the Plans.  FAC ¶¶ 2, 16, 44; *cf. Kelley I*, 2015 WL 1061497, at *4 ("Plaintiffs allege that Fidelity 'owned and controlled'" redemption accounts, "and as a result, there is no allegation that the Plans owned the accounts.").

That the float accounts were not owned by or registered to the Plans is no mere formality; it means the Plans bore no risk of loss as to the cash in those accounts and were not responsible for any fees on those accounts.  *Tussey*, 746 F.3d at 332; *cf. Kelley II*, 829 F.3d at 61 ("Fidelity's mutual fund disclosures, publicly available documents … the authenticity of which plaintiffs do not contest, provide that 'the fund faces the risk of loss'").  The avoidance of these risks of ownership only bolsters the conclusion in *Tussey*, consistent with ordinary notions of property

FIDELITY'S MOTION TO DISMISS FAC
CASE NO. 5:16-CV-04784-LHK

1    law and common sense, that the Plans cannot retroactively claim they should be entitled to the

2    float interest (as well as the other benefits of ownership).  *Tussey*, 746 F.3d at 339-40.

3          In sum, Plaintiffs allege nothing in the FAC that cures the defects identified in *Tussey* as

4    to their claims challenging Fidelity's depository float process.  The assertion that the Plans were

5    entitled to depository float and float interest fails as a matter of law because Plaintiffs cannot

6    rebut the Eighth Circuit's conclusion, reinforced by ordinary notions of property law, the terms of

7    the Trust Agreements, and federal securities law, that (1) the Plans became the owner of the

8    mutual fund shares as of 4:00 p.m. the day the contribution was received, entitling them to the full

9    benefit of mutual fund ownership, and (2) the mutual funds "held the property rights in the

10   depository float."  *Id*.

11                    4.    **The Plans Have No Right to Redemption Float**

12         The conclusions reached in *Tussey* and *Kelley II* also dispose of Plaintiffs' claims based

13   on Fidelity's handling of redemption float and float interest.  As those decisions confirm, neither

14   the Plans nor the participants have any rights in the redemption account balance because each

15   receives what they expect and are entitled to.  The participants promptly receive the full amounts

16   of their withdrawals via their elected redemption method, and the float results merely from the

17   bank processing and the time it takes participants to cash their checks; and the Plans are never

18   entitled to the withdrawn cash, much less the redemption float or float interest.  The reason is

19   simple: As "a matter of black-letter commercial law, the payee of an uncashed check has no title

20   in or right to the interest on the account funds."  *Tussey*, 746 F.3d at 340 (citing U.C.C. §

21   3-112(a)(i)).

22         As did the plaintiffs in *Tussey*, Plaintiffs here assert the bare conclusion that the Plans own

23   the redemption float and float interest.  *Id*. ("The participants assert [that] the owner is the *Plan*

24   … making the float income a plan asset.") (emphasis in original); FAC ¶¶ 14, 16.  The Court need

25   not accept that asserted conclusion and, as explained in the context of depository float, Plaintiffs

26   allege no facts establishing that the Plans have any ownership interest in the float or float interest.

27   The redemption accounts are not registered to the Plans (nor are they even alleged to be), and the

28   Plans bore no risk of loss and were not responsible for the account fees.  Thus, the Eighth

1    Circuit's reasoning in *Tussey* forecloses Plaintiffs' redemption float claims as well.  746 F.3d at

2    340 ("Absent proof of any ownership rights to the funds in the redemption account, the Plan had

3    no right to float income from that account.").

4         *Kelley II* only strengthens the conclusion in *Tussey* and is likewise fatal to Plaintiffs'

5    claims.  As the First Circuit recognized, and neither party disputes, "prior to the redemption, the

6    cash was an asset of the mutual fund" and the mutual fund shares were an asset of the Plan.  829

7    F.3d at 58, 60.  However, a Plan's ownership in the ***shares*** does not confer "plan asset" status on

8    the underlying cash before or after redemption.  *Id.* at 60; *see also* 29 U.S.C. § 1101(b)(1).  That

9    is because "[t]he payout from the redemption does not go, and is not intended to go, to the plan

10   itself."  *Kelley II*, 829 F.3d at 60.  Just as in *Kelley*, Plaintiffs here "allege no facts to support the

11   proposition that the same cash becomes a plan asset simply because it moves, not directly from

12   the fund to the participant, but from the fund through Fidelity on its way to the participant."  *Id.*

13   Moreover, Fidelity's alleged fiduciary "relationship, standing alone, is not sufficient reason to

14   think that it confers plan-asset status on everything that comes within Fidelity's possession."  *Id.*

15   In the redemption process, "Fidelity is more straightforwardly viewed as an agent charged with

16   transferring the cash from the fund to the participant outside the plan, not to the plan itself"—

17   functionally serving as an "intermediary" between the mutual funds and the participants.  *Id.* at

18   57, 60, 62; FAC ¶ 37 (Fidelity "acted as an intermediary").

19        Plaintiffs plead nothing in the FAC that could avoid this conclusion.  They do not allege,

20   for example, that "the plan bears the risk if the cash is lost after the redemption but before its

21   receipt by the participant."  *Kelley II*, 829 F.3d at 61.  As Justice Souter recognized, "Fidelity's

22   mutual fund disclosures … provide that the 'fund faces the risk of loss … if the [intermediary]

23   bank becomes insolvent."  *Id.*  Nor do Plaintiffs allege that any Trust Agreements require (or even

24   permit) withdrawn cash to be held by or for the benefit of the Plans.  The only assertions in the

25   FAC that even come close to bearing on the status of the withdrawn funds are legal conclusions

26   or argument—that float and float interest are "plan assets," that Fidelity held the withdrawn cash

27   "in the name of" or "for the benefit of" the plans, and that Fidelity is "not merely acting as an

28   intermediary."  FAC ¶¶ 14, 35-36, 40.  But the Court "need not credit the statement[s], for [they]

FIDELITY'S MOTION TO DISMISS FAC
CASE NO. 5:16-CV-04784-LHK

1   represent[] … legal conclusions, not factual assertions." *Kelley II*, 829 F.3d at 59.  The

2   conclusions are false in any event, as Plaintiffs' counsel has been told repeatedly and as the

3   Eighth Circuit confirmed after a trial.  *Tussey*, 746 F.3d at 332 n.4, 340 ("Disbursements are

4   transferred to a redemption account held for the benefit of the investment options," not the Plans).

5          At bottom, "[c]ash held by a mutual fund is not transmuted into a plan asset when it is

6   received by an intermediary whose obligation is to transfer it directly to the participant." *Kelley*

7   *II*, 829 F.3d at 62; *see also Merrimon*, 758 F.3d at 56 ("There is no basis, either in the case law or

8   in common sense, for the proposition that funds held in an insurer's general account are somehow

9   transmogrified into plan assets when they are credited to a beneficiary's account.").  Those are the

10  facts here. Plaintiffs offer no facts to show that cash redeemed by a participant becomes a plan

11  asset simply because it travels through Fidelity en route to the participant.  Indeed, to hold

12  otherwise would ignore that, by definition, the assets being redeemed by the participant are being

13  ***withdrawn*** from the Plan.  It defies logic that such assets could still be considered plan assets or

14  otherwise property of the Plans.  Fidelity cannot be held to have violated ERISA fiduciary duties

15  to the Plans by using assets for which the Plans have no ownership or entitlement.  Plaintiffs'

16  claims therefore should be rejected.  *Kelley II*, 829 F.3d at 63-64; *Tussey*, 746 F.3d at 339-40.

17          **B.      Plaintiffs Fail to Plausibly Allege a Fiduciary Breach**

18          Plaintiffs' claims fail for the additional reason that, as Judge Casper held in *Kelley I*,

19  Plaintiffs do not allege facts establishing that Fidelity was acting in a fiduciary capacity as to its

20  float processes or breached any fiduciary duties in handling float and float interest.  2015 WL

21  1061497, at *9 ("Fidelity is not an ERISA fiduciary as to float.").  As explained above, float and

22  float interest are not plan assets or otherwise property to which the Plans are entitled, and

23  Plaintiffs do not allege facts showing that Fidelity failed to perform its fiduciary obligations to

24  process participants' contributions or redemptions or to otherwise comply with the terms of the

25  governing Trust Agreements.

26          Absent such factual allegations, Plaintiffs cannot establish breach of any fiduciary

27  obligation by Fidelity regarding float.  As the First Circuit recently explained, ERISA's provision

28  governing fiduciary duties, 29 U.S.C. § 1104(a), does "not require a fiduciary to don the

FIDELITY'S MOTION TO DISMISS FAC
CASE NO. 5:16-CV-04784-LHK

1   commercial equivalent of sackcloth and ashes.  What it does require is that the fiduciary not place

2   its own interests ahead of those of" Plan participants.  *Vander Luitgaren*, 765 F.3d at 65.  Once a

3   fiduciary complies with the terms of the governing Trust Agreements and provides immediate and

4   unfettered access to the cash after the transaction clears, it has "discharge[d] its fiduciary duties"

5   and "its job as a fiduciary is done."  *Kelley I*, 2015 WL 1061497, at *9 (citing *Vander Luitgaren*,

6   765 F.3d at 64); *Merrimon*, 758 F.3d at 58; *Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090,

7   1100 (9th Cir. 2004) ("Because Defendants complied with the Plan's lawful terms and were under

8   no legal obligation to deviate from those terms, they provided Plaintiffs with their benefits due.");

9   *Faber*, 648 F.3d at 104-05.  After all, as the Supreme Court has explained, ERISA's "principal

10  function [is] to protect … contractually defined benefits," and plan sponsors such as United and

11  HP "have considerable latitude to set the terms of the plan, including the terms that spell out how

12  benefits are to be paid."  *Vander Luitgaren*, 765 F.3d at 64 (quoting *US Airways, Inc. v.

13  McCutchen*, 133 S. Ct. 1537, 1548 (2013)); *Wright*, 360 F.3d at 1100; *Robinson v. Life Ins. Co. of

14  N. Am.*, 2016 WL 2344195, at *2 (N.D. Cal. May 3, 2016).  So long as Fidelity acts in accordance

15  with the Plan documents, and in doing so does not "unfairly diminish, impair, restrict, or burden

16  the beneficiary's rights," then its role as a fiduciary is complete and it cannot be held to have

17  breached any ERISA duties of a fiduciary.  *Vander Luitgaren*, 765 F.3d at 64.

18        Here, because float and float interest are not plan assets or otherwise the property of the

19  Plans, Plaintiffs have not alleged any facts to show that Fidelity violated the terms of the Trust

20  Agreements or otherwise unfairly diminished, impaired, restricted, or burdened any participant's

21  rights with respect to its depository or redemption float processes.  Plaintiffs do not allege that

22  Fidelity failed to disburse funds to participants promptly in response to withdrawal requests or

23  that Fidelity failed to properly process and invest contributions as directed.  To be sure, Plaintiffs

24  allege that the Trust Agreements prohibit Fidelity from "diverting part of the Trust" allocable to

25  the Plan, and they assert that Fidelity's float processes violated this provision.  FAC ¶¶ 42, 49;

26  RJN, Ex. A § 3.  But, again, if float is not part of the Trust allocable to the Plans—*i.e.*, it is not a

27  plan asset or otherwise property of the Plans—then the terms of the Trust Agreements are not

28  violated.  *See supra* Section IV.A.  Thus, the FAC includes no facts to establish that Fidelity

1   violated the governing Trust Agreements with respect to its float processes or engaged in any

2   conduct that would "unfairly diminish, impair, restrict, or burden the beneficiary's rights."

3   *Vander Luitgaren*, 765 F.3d at 64; *Kelley I*, 2015 WL 1061497, at *9; *Faber*, 648 F.3d at 104-05.

4   **C.    Additional Problems Exist with Plaintiffs' Non-Disclosure Claim Based on**
         **DOL Guidance and Regulations**
5

6           The FAC includes additional legal argument that Fidelity "failed to disclose" its alleged

7   float processes, but this repackaged argument not only fails because float is not a plan asset, but

8   also because no disclosure obligation applies here. *See* FAC ¶¶ 61-73 & Claim III. Plaintiffs'

9   non-disclosure claim is based on Fidelity's alleged "fail[ure] to disclose the nature and extent of

10  its activities in managing the Plans and the Plans' assets, including its diversion of cash from the

11  Plans and from Plan transactions." *Id.* ¶ 113; *see also id.* ¶ 72. Even putting aside factual

12  disputes, multiple problems exist with Plaintiffs' contention.

13          First, as the language of the allegation makes clear, this claim—like all the others—turns

14  on the fundamentally untenable and twice-rejected premise that float and float interest were "plan

15  assets" or otherwise monies to which the Plans were entitled. Fidelity could not, however, have

16  "failed to disclose" its diversion of cash "from the Plans" and "from Plan transactions" if the cash

17  did not belong to the Plans and was not a plan asset. Otherwise, there is no "diversion" from the

18  Plan, nor any Plan transaction related to Fidelity's handling of float. And because float and float

19  interest are not plan assets or otherwise property of the Plans, this claim fails as a matter of law

20  based on reasoning similar to that adopted in *Tussey* and *Kelley II* and discussed in detail above.

21          Second, this claim also fails because Fidelity's alleged disclosure obligation, based largely

22  on old DOL guidance deemed inapplicable by the majority in *Tussey*, does not apply. Plaintiffs

23  cite several DOL advisory opinions and regulations that require, under specific circumstances,

24  certain disclosures concerning float. FAC ¶¶ 54-55, 63-68. But the disclosure obligations

25  Plaintiffs invoke on their face arise only where a fiduciary actually earns increased compensation

26  from the Plans. For example, DOL Advisory Opinion 2002-3 advises service providers to

27  "[d]isclose the specific circumstances under which float will be earned and retained." FAC ¶¶ 54,

28  63. The same is true of Advisory Opinion 93-24A. *Id.* ¶ 54 ("receipt of income from the

- 23 -

1    'float'"); *Kelley I*, 2015 WL 1061497, at *7 (DOL advisory opinions concern obligations of

2    fiduciaries and service providers "when retaining the earnings" from float).  The regulations

3    Plaintiffs cite are no different and pertain to disclosure obligations where a fiduciary receives

4    "compensation" or "revenue" from float.  FAC ¶¶ 64-68.  And to the extent any inconsistency

5    exists between the DOL opinions and the district and appellate courts' analysis distinguishing the

6    DOL opinions from Fidelity's practices, the courts' analysis must control.  *See Kelley I*, 2015 WL

7    2015 WL 1061497, at *7; *Kelley II*, 829 F.3d at 63 & n.9; *Tussey*, 746 F.3d at 341-42 (dissenting

8    opinion relying on DOL guidance deemed unpersuasive by majority opinion).

9           Third, in their FAC, Plaintiffs make the vague assertion that Fidelity used float "for its

10   own benefit," but this conjecture is unsupported by factual allegations.  FAC ¶ 2.  Nor do

11   Plaintiffs allege anything improper about using float interest to defray bank fees, as ERISA

12   expressly authorizes.  29 U.S.C. § 1104(a)(1)(A) (fiduciary may "defray[] reasonable expenses"

13   of plan administration).  Plaintiffs do not, for example, provide any reason to believe that—

14   contrary to what Plaintiffs' counsel has been told repeatedly—Fidelity kept as compensation net

15   float interest after defraying reasonable bank fees under its practices before late 2011.  Both the

16   First and Eighth Circuits recognized that the opposite was true—Fidelity did not retain any float

17   interest for itself under its float processes in that period.  *Tussey*, 746 F.3d at 332 ("Fidelity did

18   not receive the float or float interest."); *Kelley II*, 829 F.3d at 59.  And when Fidelity modified its

19   float processes, it fully disclosed those processes and obtained the consent and acknowledgment

20   from the Plans it serves.  *E.g.*, RJN, Ex. B.  Thus, the allegations and authorities cited in the FAC

21   do not give rise to a claim for non-disclosure.

22          Finally, Fidelity cannot, as a matter of law and common sense, have breached any

23   fiduciary duty by failing to disclose what the Plans already knew.  *Cf. Merrimon*, 758 F.3d at 60

24   (no fiduciary breach where trustee remitted only partial interest back to beneficiaries).  Plaintiffs

25   contend that Fidelity failed to disclose that Plans were not receiving float interest but, of course,

26   this would have been plainly apparent to the Plans each time they received their Annual Returns

27   reflecting the absence of float income attributable to the Plans.  Plaintiffs admit as much by

28   acknowledging that the "Annual Returns" for HP and United did not reflect the existence of any

float.  FAC ¶ 69.  Thus, Fidelity could not possibly have breached any fiduciary duty by failing to disclose what was already obvious to the Plans.

## V.     **CONCLUSION**

Plaintiffs' claims against Fidelity are no better now than when the First and Eighth Circuits rejected them in *Kelley II* and *Tussey*.  As a matter of law, Fidelity's float processes did not violate any fiduciary obligation under ERISA.  Fidelity requests that the Court end this litigation and dismiss Claims I-III in the FAC with prejudice.

Dated:  November 2, 2016                              O'MELVENY & MYERS LLP

                                                     By:  /s/ Randall W. Edwards
                                                          Randall W. Edwards

                                                     Attorneys for Defendant
                                                     Fidelity Management Trust Company